[No. S038982. May 4, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS GIONIS, Defendant and Appellant.

## COUNSEL

William J. Kopeny for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Bearumont, Holly D. Wilkens and Rhonda Cartwright-Ladendorf, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BAXTER, J.—On October 3, 1988, Aissa Marie Wayne and her friend Roger Luby were brutally assaulted by two men. Four men were arrested, including defendant Thomas Gionis, Wayne's former husband. At defendant's trial, the prosecutor argued that Wayne and defendant had been locked in a bitter custody battle over their young daughter, Anastasia, and that defendant was behind the assault. John Lueck, an attorney, was permitted to testify for the prosecution that defendant had told him, among other things, that Wayne had no idea how easy it would be for defendant to hire someone to "really take care of her," and that if defendant were to do something, he

would wait until an opportune time to act in order to avoid suspicion. The jury convicted defendant of conspiracy to commit an assault (Pen. Code, former § 182, subd. 1, as amended by Stats. 1989, ch. 897, § 15, p. 3062, now Pen. Code, § 182, subd. (a)(1); Pen. Code, § 240), conspiracy to commit a trespass (Pen. Code, former § 182, subd. 1, as amended by Stats. 1989, ch. 897, § 15, p. 3062, now Pen. Code, § 182, subd. (a)(1); Pen. Code, § 602.5), assault with a deadly weapon on Luby (Pen. Code, § 245, subd. (a)(1)), and assault with a firearm on Wayne (Pen. Code, § 245, subd. (a)(2)). Defendant was sentenced to an aggregate term of five years in state prison.

The Court of Appeal reversed defendant's convictions. It determined that the trial court prejudicially erred in admitting the evidence of defendant's statements to Lueck in derogation of the attorney-client privilege, even though the statements were made after Lueck had explicitly refused to represent defendant in the legal proceedings involving Wayne. The court also found that defendant was prejudiced by the prosecutor's misconduct and improper disparagement of defense counsel in closing arguments.

We granted review in this case to determine whether defendant's communications with Lueck were protected by the attorney-client privilege, and whether the prosecutor's arguments constituted prejudicial misconduct. On the privilege issue, we hold that the Court of Appeal erred in disturbing the trial court's determination that the privilege did not apply. In addition, we conclude that defendant's statements were not inadmissible under Evidence Code section 352. Finally, we find that the Court of Appeal erred in determining that the prosecutor committed prejudicial misconduct. We therefore reverse the judgment of the Court of Appeal, and remand the matter to that court for further proceedings not inconsistent with this opinion.

## I. Factual and Procedural Background

Defendant, a doctor, and Aissa Marie Wayne, daughter of the late movie actor John Wayne, were married in 1986. In February 1987, defendant and Wayne had a daughter named Anastasia.

Soon after the baby was born, the marriage began to deteriorate. Defendant twice threatened to kill Wayne if she got in the way of his relationship with Anastasia. He also warned Wayne that if she left him he would flee to Greece with Anastasia and Wayne would never see her daughter again. Despite these threats, Wayne left defendant in June 1987, taking Anastasia with her.

A bitter custody dispute ensued. A few months after Wayne left defendant, she discovered that she was under surveillance by Dan Gal, a private

investigator hired by defendant. Although Wayne knew she was being watched, she pursued her normal lifestyle.

Christine Foss was an employee of defendant at his clinics in Upland, Corona del Mar and Palm Springs. In July 1987, defendant told Foss of his anger over Wayne's departure and said he could hire people to physically harm Wayne if she ever "messed with him." Subsequently, defendant told Foss and a coworker to resign from his clinics after they went to watch Wayne play tennis in Corona del Mar. Foss did not report her conversation with defendant to the police until three months after the assaults on Wayne and Luby in October 1988.

John Lueck was an attorney who referred clients to defendant for medical evaluations. In May or June 1987, Lueck received a telephone call from defendant asking him to come to defendant's home. Defendant was in tears. He said he had just been served with divorce papers, and he needed somebody to talk to because he was upset. Although Lueck initially declined to go to defendant's home, he ultimately agreed to meet defendant after making it clear that he would not be willing to have any involvement as a lawyer in defendant's dissolution case. Lueck refused to represent defendant because he knew both defendant and Wayne.

When Lueck arrived at defendant's home, defendant said he was upset about the circumstances of the separation and about the fact that Wayne had taken the baby. Defendant displayed very wide mood swings, alternating between tears and anger. At one point during the visit, defendant showed Lueck a declaration by Wayne in support of an order to show cause, and indicated he would like to change venue from Orange County to Los Angeles County because Wayne was the daughter of one of Orange County's most famous residents; the county airport was his namesake. Lueck, speaking as defendant's friend, said he thought a change of venue might be appropriate, but did not offer to do it. Lueck also told defendant to quickly retain a good attorney.

While in one of his very angry moods, defendant showed Lueck some holes in a wall, as well as a closet door off its track in the bedroom. Defendant said that the altercation which resulted in the holes in the wall was nothing relative to what he was capable of doing. He also told Lueck that Wayne "had no idea how easy it would be for him to pay somebody to really take care of her."

After hearing defendant make these statements, Lueck commented that if something were to happen to Wayne during the dissolution or a child

custody dispute, defendant would certainly be the primary suspect. Defendant replied he "was too smart to do something like that at a time when it would be obvious that it was his responsibility." Defendant then said that if he were to do something, he "would wait until an opportune time and circumstances [*sic*] so that suspicion wouldn't be directed towards him." Defendant also told Lueck he had friends, family and money in Greece available to him in the event he needed to leave the country. Lueck did not immediately contact the police about defendant's statements because at the time he believed they were simply expressions of anger.

On a Friday in October 1987, defendant showed up at Lueck's office, apparently upset with some papers that had been prepared by his counsel in his dissolution case. Defendant appeared desperate. He told Lueck that Wayne was trying to prevent him from having Anastasia at her baptism, that his attorney was unavailable, and that something had to be done immediately because people were leaving Greece that Friday afternoon for the baptism. Defendant pleaded with Lueck to go to court on an ex parte basis. Lueck agreed, but when he went to court, an irate judge told him that arrangements had already been made. The judge then accused Lueck of being part of an effort to harass Wayne. Lueck was paid $750 for the court appearance.

During January and February 1988, Wayne began a romantic relationship with Roger Luby. Wayne had been upset over the breakup of her marriage and the custody dispute, and she leaned heavily on Luby for emotional support. At some point, defendant made sarcastic remarks to Wayne concerning Luby and commented on the considerable amount of time that they spent playing tennis.

In the summer of 1988, Robert Cornely visited Gal, the private investigator hired by defendant. At Gal's house were Jerrel (or Jerry) Hintergardt and another man. Cornely had agreed to help Gal by going with Hintergardt and the other man to serve papers regarding a custody dispute at a house in the beach area. Cornely was unaware anything unlawful was planned, but he was uncomfortable and felt the situation was "not right." Cornely and the others left after the person for whom they were waiting did not come home.

On the morning of October 3, 1988, Wayne and Luby attended an aerobics class in Corona del Mar. At approximately 11:30 a.m., they returned to Luby's residence in Newport Beach. Hintergardt and a man named Jeffrey Bouey were waiting. They approached Luby and Wayne as Luby and Wayne exited their car in the garage, and asked Luby if his name was Roger Luby. Luby said yes.

Suddenly, the men drew guns. When Luby asked if they were joking, Hintergardt said, "This isn't no fucking joke," and struck Luby on the head

with his gun. Hintergardt threatened to kill Luby if he yelled or screamed. He forced Luby to the ground, holding the gun to his head. After handcuffing Luby's hands and ankles, Hintergardt repeatedly smashed Luby's face into the concrete floor, warning him not to move or scream. Hintergardt then severed Luby's right Achilles tendon with a knife, and attempted to do the same to the left tendon.

Meanwhile, Bouey held a gun to Wayne's head and forced her to the ground. When Hintergardt finished with Luby, he handcuffed Wayne's hands and feet. Hintergardt yelled at Wayne, then grabbed her hair and slammed her face into the concrete floor twice. Wayne felt her head split open and blood stream down her face. Hintergardt told her, "You're fucking with the wrong people."

After Hintergardt and Bouey left, Wayne and Luby were taken to a hospital for medical treatment. Wayne required more than two dozen stitches for the wound to her head. Luby received stitches on his head and on his severed right Achilles tendon. He had to wear a full hip-to-ankle cast for three weeks, then a knee-to-ankle cast for some time after that. Even after months of therapy, Luby's right Achilles tendon felt dead and numb.

Gal, Hintergardt, Bouey and defendant were arrested. None of them testified at defendant's trial. Telephone records, however, showed that more than 1,000 telephone calls were made between numbers connected to Gal and defendant (and calls between telephones connected to Gal and Hintergardt and Hintergardt and Bouey). Although there were never any calls directly between the numbers for defendant and Hintergardt or Bouey, a flurry of calls between the numbers for Gal and defendant occurred on October 3, 1988, just before and after the attack on Wayne and Luby. Several calls were placed between Hintergardt and Gal on that date as well. The records also revealed that, on the day after the attack, Gal called defendant's number immediately after a police officer told Gal that his car was seen near the scene of an attack the day before, and that a detective would like to speak with him.[1] In addition, bank records showed that defendant paid a considerable amount of money to Gal during the period of the surveillance. By far the largest payment, $40,000, was paid within the two weeks preceding the attacks.

The jury found defendant guilty on all four charged counts: conspiracy to commit an assault, conspiracy to commit a trespass, assault with a deadly

---

[1]The police officer approached Gal while he was parked near the house where Wayne had moved with Anastasia after the attack.

weapon on Luby, and assault with a firearm on Wayne.[2] After denying defendant's motion for a new trial, the trial court sentenced him to an aggregate term of five years in state prison. Additionally, the court granted a motion for bail pending appeal, and set bail at $2 million.

The Court of Appeal reversed defendant's convictions, finding that defendant was prejudiced by a combination of the trial court's erroneous admission of defendant's statements to John Lueck in violation of the attorney-client privilege, and the prosecutor's misconduct and improper disparagement of defense counsel in closing arguments. We granted the People's petition for review.

## II. DISCUSSION

### A. Admission of Lueck's Testimony

The first issue in this case concerns Lueck's testimony that defendant told him: (1) "the altercation which resulted in the holes in the wall were nothing relative to what he [defendant] was capable of doing"; (2) Wayne "had no idea how easy it would be for him [defendant] to pay somebody to really take care of her"; (3) defendant "was too smart to do something like that [to Wayne] at a time when it would be obvious that it was his responsibility; and (4) "if he [defendant] were to do something, he would wait until an opportune time and circumstances [sic] so that suspicion wouldn't be directed towards him." We must determine whether these statements, all of which were made after Lueck refused to act as defendant's lawyer, are protected under the attorney-client privilege. If defendant's statements are found to be unprivileged, we must then decide whether the evidence nonetheless was inadmissible under Evidence Code section 352.[3]

### 1. Attorney-client Privilege

■ In the absence of a statute, no person has the privilege to prevent another from testifying or from disclosing any matter. This rule, codified at section 911, subdivision (c), reflects the Legislature's clear intent to abolish common law privileges and to keep the courts from creating new nonstatutory privileges as a matter of judicial policy. (§ 12, subd. (c); *Welfare Rights Organization* v. *Crisan* (1983) 33 Cal.3d 766, 769 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214].)

[2] This was defendant's second trial. At his first trial, defendant had been charged with two conspiracy counts alleging several overt acts in addition to the two alleged in each count here. Defendant also had been charged with threatening and dissuading witness Aissa Wayne from testifying, false imprisonment and burglary. Lueck did not testify at the first trial, which ended with a deadlocked jury.

[3] All further statutory references are to the Evidence Code unless otherwise indicated.

Under section 954, a client holds a privilege to prevent the disclosure of confidential communications between client and lawyer. As pertinent here, a "client" includes a person who "consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity" (§ 951), while "confidential communications" include "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence" (§ 952). A client who has no guardian or conservator is the "holder of the privilege" (§ 953, subd. (a)), and only the holder may waive it. ■ In codifying the attorney-client privilege, the Legislature determined that " 'the benefits derived therefrom justify the risk that unjust decisions may sometimes result from the suppression of relevant evidence.' " (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 600 [208 Cal.Rptr. 886, 691 P.2d 642], quoting *City & County of San Francisco* v. *Superior Court* (1951) 37 Cal.2d 227, 235 [231 P.2d 26, 25 A.L.R.4th 1418].)

The attorney-client privilege is based on grounds of public policy and is in furtherance of the proper and orderly functioning of our judicial system, which necessarily depends on the confidential relationship between the attorney and the client. (*People* v. *Velasquez* (1987) 192 Cal.App.3d 319, 327 [237 Cal.Rptr. 366].) Without the ability to make a full disclosure of the facts to the attorney, the client risks inadequate representation: " 'Unless he makes known to the lawyer all the facts, the advice which follows will be useless, if not misleading; the lawsuit will be conducted along improper lines, the trial will be full of surprises, much useless litigation may result.' " (*City & County of San Francisco* v. *Superior Court, supra,* 37 Cal.2d at p. 235.) The privilege "applies not only to communications made in anticipation of litigation, but also to legal advice when no litigation is threatened." (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 371 [20 Cal.Rptr.2d 330, 853 P.2d 496].) Thus, by encouraging complete disclosures, the attorney-client privilege enables the attorney to provide suitable legal representation. (*City & County of San Francisco* v. *Superior Court, supra,* 37 Cal.2d at p. 235; see *People* v. *Clark* (1990) 50 Cal.3d 583, 620 [268 Cal.Rptr. 399, 789 P.2d 127].)

In the criminal context, "these policies assume particular significance: ' "As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." . . . Thus, if an accused is to derive the full benefits of his right to counsel, he must have the assurance of confidentiality and privacy of communication with his attorney.' [Citations.]" (*People* v. *Meredith* (1981) 29 Cal.3d 682, 691 [175 Cal.Rptr. 612, 631 P.2d 46].)

 To further its purposes, the attorney-client privilege does not require that the attorney actually be retained. "[W]here a person seeks the assistance of an attorney with a view to employing him professionally, any information acquired by the attorney is privileged whether or not actual employment results." (*People* v. *Canfield* (1974) 12 Cal.3d 699, 705 [117 Cal.Rptr. 81, 527 P.2d 633]; *People* v. *Dorrance* (1944) 65 Cal.App.2d 125, 129 [150 P.2d 10]; *Estate of Dupont* (1943) 60 Cal.App.2d 276, 288-289 [140 P.2d 866].) The rationale for this rule is compelling: "no person could ever safely consult an attorney for the first time with a view to his employment if the privilege depended on the chance of whether the attorney after hearing his statement of the facts decided to accept the employment or decline it." (*Estate of Dupont*, *supra*, 60 Cal.App.2d at p. 289.)

 Although the attorney-client privilege is essential to our system of justice, it can and does result in the withholding of relevant information from the fact finder. Therefore, "[t]he party claiming the privilege carries the burden of showing that the evidence which it seeks to suppress is within the terms of the statute." (*D.I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 729 [36 Cal.Rptr. 468, 388 P.2d 700]; *Collette* v. *Sarrasin* (1920) 184 Cal. 283, 288 [193 P. 571].)

 On appeal, the scope of judicial review is limited. "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it [citations]." (*D.I. Chadbourne, Inc.* v. *Superior Court*, *supra*, 60 Cal.2d at p. 729.) In this case, the question is whether, as a matter of law, the record establishes that the incriminating statements attributed to defendant by John Lueck constituted information transmitted between client and attorney in the course of an attorney-client relationship.[4]

The trial court determined below that the statements attributed to defendant by Lueck were not protected by the attorney-client privilege. According to the record, Lueck, an attorney, was defendant's friend and had been to

---

[4]We observe that, under section 956, there is no privilege if the services of a lawyer were sought or obtained "to enable or aid anyone to commit or plan to commit a crime . . . ." Moreover, under section 956.5, effective January 1, 1994, there is no privilege if the lawyer reasonably believes that disclosure of a confidential communication "is necessary to prevent the client from committing a criminal act that the lawyer believes is likely to result in death or substantial bodily harm." Since the People make no contention in this court that these provisions are applicable in this case, we express no views on the matter.

defendant's home approximately 15 times.[5] The two shared a business relationship in which Lueck referred between 100 and 200 clients to defendant. In May or June of 1987, defendant telephoned Lueck and asked him to come to his house. Defendant was upset over having just been served with dissolution papers. *Before defendant made any incriminating disclosure,* Lueck specifically stated he would not represent defendant in the dissolution proceedings. Lueck was very clear that he in no way wanted to be involved in the dispute between defendant and Wayne. Although the record contains no explanation for the trial court's refusal to find the privilege applicable, we may infer that the above evidence, which was uncontradicted by defendant, persuaded the court that no attorney-client relationship existed at the time of defendant's disclosures.

In ruling that the trial court erred, the Court of Appeal placed heavy emphasis on other evidence in the record indicating that issues of a legal nature were discussed during Lueck's visit to defendant's home. This evidence consisted of Lueck's testimony at the bail review hearing that defendant showed him some papers from the dissolution action, including a declaration by Wayne, which apparently contained assertions that defendant physically assaulted Wayne. Lueck read the declaration and asked defendant: "Is this true?" When defendant replied that most of it was, Lueck told defendant to retain capable counsel quickly. In addition, the subject of venue was brought up at some point, with Lueck commenting that a change of venue might be appropriate.[6] Noting that for purposes of the attorney-client privilege, the term "client" is statutorily defined as "a person who . . . consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity" (§ 951), the Court of Appeal concluded that the privilege was not limited to those cases where the client agreed to pay the attorney for advice or where the attorney agreed to represent the potential client.

---

[5] The record indicates that the parties had stipulated the trial court could consider Lueck's testimony at a bail review hearing before the municipal court and a police report of Lueck's statements to Sergeant Jackson of the Newport Beach Police Department. The record also shows that the trial court heard live, but limited, testimony from Lueck in which he confirmed that the State Bar had closed, without prejudice, its investigation into a complaint filed on behalf of defendant against Lueck. Lueck also offered corrections to perceived factual errors in Sergeant Jackson's report.

We note that the magistrate excluded Lueck's testimony at the bail review. During defendant's first trial, the People did not challenge this ruling and did not offer Lueck's testimony. At the retrial, the People moved, *in limine,* to admit this evidence, disputing that it was privileged or otherwise inadmissible under section 352.

[6] The alleged discussion regarding venue is not contained in the police report at all, and is only briefly mentioned in the bail review hearing transcript. According to the transcript, defendant apparently asked Lueck about a change in venue, and Lueck responded that it might be an appropriate thing to do, but did not offer to do it.

■ We cannot endorse the Court of Appeal's apparent view that the attorney-client privilege applies whenever issues touching upon legal matters are discussed with an attorney. That has never been the law. Significantly, a communication is not privileged, even though it may involve a legal matter, if it has no relation to any professional relationship of the attorney with the client. (*Solon* v. *Lichtenstein* (1952) 39 Cal.2d 75, 79-80 [244 P.2d 907] [where client asked attorney to pursue transfer of cemetery lots to certain relative of client, balance of conversation concerning client's family arrangements for division of property upon death was not privileged].) Moreover, it is not enough that the client seek advice from an attorney; such advice must be sought from the attorney "in his professional capacity." (§ 951.)

■ In contrast to the authorities relied upon by the Court of Appeal, this is not a situation in which an individual disclosed information while exploring the possibility of retaining the lawyer. (*People* v. *Canfield, supra,* 12 Cal.3d at pp. 704-705 [privilege protects indigent defendant's disclosures to public defender's representative, including defendant's financial eligibility statement]; see also *People* v. *Dorrance, supra,* 65 Cal.App.2d at p. 129; *Estate of Dupont, supra,* 60 Cal.App.2d at pp. 288-289.) Nor is the situation here similar to that in *Benge* v. *Superior Court* (1982) 131 Cal.App.3d 336 [182 Cal.Rptr. 275], in which the court found privileged communications made at a closed union meeting attended by union members, two attorneys whose law firm was under a retainer agreement to provide legal advice to both the union and its members, and possibly a doctor. In that case, the union members had gone to the meeting for the purpose of discussing their legal rights against the employer and others for job-related injuries. (131 Cal.App.3d at pp. 347-348.) Unlike the factual scenarios in those decisions, the record here demonstrates that defendant was told in no uncertain terms, prior to making any of the challenged communications, that Lueck wanted no involvement in the legal proceedings concerning defendant and Wayne. The instant case thus finds no parallel in those decisions.

While it is firmly established that the privilege protects confidential communications made during initial consultations with an attorney, neither the relevant statutory provisions nor California decisional law suggests that the privilege extends to disclosures made *after* the attorney refuses to undertake representation. Indeed, such a proposition seems to stand in direct contradiction to one older decision, *Finnell* v. *Finnell* (1909) 156 Cal. 589 [105 P. 740]. In that case, an attorney was permitted to testify, over a defendant's objection, concerning a conversation in which the attorney expressed a brief legal opinion in reply to a question. There we held that the defendant's claim of attorney-client privilege was properly rejected, noting that the attorney "further said that he was not anybody's attorney in the

matter." (156 Cal. at p. 602.) Nonetheless, while that decision is apposite, we hesitate to find it dispositive because its facts indicate that an unauthorized third person was present when the challenged remarks were made, and the holding did not specify the grounds for rejection of the privilege. (See *ibid.*)

Although there is a dearth of California case law directly addressing the issue, authorities in other jurisdictions appear to uniformly hold that the attorney-client privilege does not protect statements made after an attorney declines employment. (E.g., *State* v. *Hansen* (1993) 122 Wn.2d 712 [862 P.2d 117, 121]; *United States* v. *Dennis* (2d Cir. 1988) 843 F.2d 652, 657; *State* v. *Iwakiri* (1984) 106 Idaho 618 [682 P.2d 571, 574, fn. 1]; *McGrede* v. *Rembert Nat. Bank* (Tex.Civ.App. 1941) 147 S.W.2d 580, 584; *Farley* v. *Peebles* (1897) 50 Neb. 723 [70 N.W. 231, 233].)[7] As the Washington Supreme Court reasoned in *State* v. *Hansen, supra,* once the attorney refused to represent the defendant and explained that he might be better off finding another attorney, there was no basis for the defendant to form a reasonable belief that an attorney-client relationship existed. (862 P.2d at p. 121.)

This viewpoint is shared by the authors of two leading treatises on evidence. In Wigmore's words, "if the client continues his communication after the attorney's refusal to act for him, or if a person knowingly attempts to retain one who is already retained by the opponent and therefore was not retainable by the consultant, he does not need or deserve the protection of the privilege." (8 Wigmore, Evidence (McNaughton ed. 1961) § 2304, p. 587, fn. omitted.) McCormick agrees, noting: "Of course, statements made after the employment is declined are not privileged." (1 McCormick on Evidence (4th ed. 1992) The Client's Privilege, § 88, p. 322, fn. 3.)

While not controlling, the above authorities are compelling in their logic. Although we are not convinced that the Evidence Code in California requires the adoption of a bright line rule that *any* communication made after an attorney's refusal of representation is unprivileged as a matter of law, nonetheless we are persuaded that a person could have no reasonable expectation of being represented by an attorney after the attorney's explicit refusal to undertake representation. (Compare with *People* v. *Gardner* (1980) 106 Cal.App.3d 882, 887 [165 Cal.Rptr. 415] [criminal suspect's letter, which was addressed to public defender's office but seized by police prior to its delivery, found to be privileged where letter contained request for legal advice *and suspect had a reasonable expectation of being represented by public defender*].) Moreover, evidence of an attorney's express refusal of representation may give rise to a reasonable inference that, in continuing to speak to the attorney, the person is not thereafter consulting with the attorney for advice "in his professional capacity."

---

[7] We looked for authority to the contrary, but found none.

In this case, Lueck's unequivocal refusal to represent defendant, made before any of the incriminating disclosures were made, detracts significantly from defendant's claim of privilege. There is no evidence indicating that, at the time of Lueck's visit to his home or when he made the incriminating statements, defendant did not understand Lueck's position. Defendant's insistence on talking with Lueck, despite Lueck's clear and reiterated unwillingness to act as defendant's lawyer or to have any involvement in defendant's legal dispute with Wayne, gives rise to the reasonable inference that defendant sought to speak with Lueck in his capacity as a friend, not as an attorney.[8] Taken together, this evidence lends substantial weight to the conclusion that, even though legal topics were discussed, defendant was not consulting with Lueck for advice in his professional capacity. Accordingly, the record adequately supports the trial court's determination that no attorney-client relationship existed.[9] That Lueck agreed some four or five months later to represent defendant on a one-time emergency basis, and that the

---

[8]Justice Mosk's reliance upon *People* v. *Fentress* (1980) 103 Misc.2d 179 [425 N.Y.S.2d 485] is misplaced. (See dis. opn., *post*, at p. 1232.) Unlike the situation here, Schwartz, the attorney in that case, had not refused professional involvement before his friend made an allegedly privileged communication. Significantly, however, the court in *People* v. *Fentress*, *supra*, agreed that such a refusal would have defeated the privilege. (425 N.Y.S.2d at p. 490 ["there would be no privilege if . . . Schwartz was acting solely as a friend, abjuring professional involvement . . . ."].)

[9]After the trial court ruled that defendant's statements were not protected by the attorney-client privilege, other evidence was presented to the jury that further supported the inapplicability of the privilege. Lueck testified that, after initially refusing defendant's request to come to his house, he ultimately agreed to see defendant "after telling him that I had previously told him that I would not be willing to have any involvement as a lawyer in his divorce." Lueck's trial testimony also supported the reasonable inference that defendant, who was distraught over having been served with divorce papers, simply wanted a shoulder to cry on and did not seek to speak with Lueck in his professional capacity as a lawyer. In Lueck's words, defendant "was in tears" and told Lueck "that he was very upset and he needed somebody to talk to because of the fact that he was upset."

We also note that, at the time of the hearing on the admissibility of Lueck's testimony, the prosecutor had submitted a letter written by Lueck to the State Bar that defended his appearance as a witness against defendant. The Court of Appeal relied on this letter in reversing the judgment, finding that it evidenced Lueck's self-interest and inconsistent statements with regard to his conversations with defendant. Because it is unclear from the record whether the parties actually stipulated to the trial court's consideration of the factual assertions contained in this letter (see fn. 5, *ante*), we did not consider it in drawing our conclusions. However, assuming the letter is properly considered, we observe that it provides in pertinent part: "[¶] In or about the spring of 1986, I became personally acquainted with Thomas A. Gionis, M.D. and his new wife at the time, Aissa Wayne Gionis (John Wayne's daughter). Dr. Gionis invited me to have lunch with him and his wife. His primary purpose was to solicit referrals from me to his medical practice located in an adjacent City to the location of my office. Throughout the succeeding year, I saw both Dr. Gionis and his wife Aissa who worked at his office. While I never considered myself a close personal friend of either, the relationship with both of them was friendly, and I did not favor either of them over the other. [¶] In or about April 1987, I received a call from Dr. Gionis at my office, who at the time was clearly in an highly emotional state. He indicated that he and Aissa were

disclosures surrounding this emergency matter were found to be privileged by the trial court, fail to undermine the conclusion that the earlier communications were unprivileged. (See *Carroll v. Sprague* (1881) 59 Cal. 655, 660.) Under these circumstances, it was error for the Court of Appeal to disturb the trial court's determination. (*D.I. Chadbourne, Inc.* v. *Superior Court, supra,* 60 Cal.2d at p. 729.)[10]

### 2. *Section 352*

■ Defendant argues that, even if the privilege does not apply, Lueck's testimony should have been excluded as being substantially more prejudicial than probative. (§ 352.) We disagree for the reasons stated below.

As indicated above, the challenged testimony included defendant's statements that Wayne had no idea how easy it would be for him to hire someone to "really take care of her," that defendant was too smart to do something to Wayne in an obvious manner, and that if he were to do something, he would wait until an opportune time to avoid suspicion. Since the principal issue in the case was the identity of the person who prompted the physical assault on Wayne and Luby, these statements were of significant probative value as evidence of defendant's motive, plan and design.

We reject defendant's contention that the statements attributed to him were not probative because they were made long before the assaults occurred and were therefore remote. We are also unpersuaded by his argument that the statements were simply expressions of hurt and anger made on the day

separated, and that a divorce and child custody case were soon to follow. I immediately told him that I would not represent him against her, and that I did not wish to become involved in litigation between them. At the time, he was extremely upset emotionally, and asked that I come visit him at his home in the capacity of a friend, not a lawyer. I made it perfectly clear before I left my office to come to his home that I was seeing him strictly as a friend, and not as a lawyer, and that I would avoid any legal questions concerning the disagreements between them. [¶] While at his residence on this occasion, I listened to his emotional upset over being separated from his baby, as well as the disagreements between them as husband and wife. On those occasions in which he attempted to ask legal questions, I reminded him of my unwillingness to become involved in the case, and urged that he seek counsel immediately. The only subject even approaching legal advise [*sic*] during that conversation involved whether or not he should retain counsel in the East District of Los Angeles Superior Court where they both lived as husband and wife, or within the County of Orange where Mrs. Gionis had filed her divorce action. I mentioned he could speak to his attorney regarding a change of venue." In our view, the factual assertions set forth in this letter are substantially consistent with Lueck's other statements and fail to compel a different result.

[10]In her concurring and dissenting opinion, Justice Kennard appears to conclude it was harmless error for the change of venue communications to have been admitted at trial. (Conc. & dis. opn., *post,* at pp. 1224-1225.) We note that it was defense counsel, not the prosecutor, who elicited Lueck's trial testimony about the venue communications, and that defendant is not claiming prejudice over its admission.

Wayne left him. Even though the statements were made almost a year and a half prior to the assaults, they were not so remote as to be lacking in probative value, especially since the statements themselves indicated that if defendant were to do something, he would time his actions so that he could avoid suspicion. Moreover, whether the statements reflected merely a transitory state of mind, as opposed to something more, was a question for the jury to decide.

In light of the highly probative nature of the statements, the trial court acted well within its broad discretion under section 352 in concluding that the potential for prejudice was outweighed. ■ As we recently explained: "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*. In applying section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189], italics added.) No error appears.[11]

### B. *Prosecutorial Misconduct*

■ The Court of Appeal determined that misconduct by the prosecutor in rebuttal argument independently required reversal of defendant's convictions. In the words of the court: "After virtually objectionless and unobjectionable arguments by both lawyers, the prosecutor rose to deliver a lengthy, vitriolic rebuttal laced with personal attacks on defense counsel, whose skillful and scrupulously fair closing argument had put the prosecution case in considerable jeopardy."

■ We recently explicated the principles governing prosecutorial misconduct claims as follows: "A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' (*People v. Harris* (1989) 47 Cal.3d

---

[11]Defendant also seems to suggest that, in closing arguments, the prosecutor misused the evidence introduced through Lueck. We reject any such claims. At trial, defendant failed to make any objections or request any admonishments. (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see also *People v. Rowland* (1992) 4 Cal.4th 238, 274 [14 Cal.Rptr.2d 377, 841 P.2d 897].) Moreover, these matters are not properly raised: they are perfunctorily asserted without argument or authorities in support.

1047, 1084 [255 Cal.Rptr. 352, 767 P.2d 619], citing *Donnelly* v. *DeChristo-foro* (1974) 416 U.S. 637, 642-643 [40 L.Ed.2d 431, 436-437, 94 S.Ct. 1868].) But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' [Citations.] Included within the deceptive or reprehensible methods we have held to constitute prosecutorial misconduct are personal attacks on the integrity of opposing counsel. [Citation.]" (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].)

■ Generally, a reviewing court will not review a claim of misconduct in the absence of an objection and request for admonishment at trial. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People* v. *Price, supra*, 1 Cal.4th at p. 447; see also *People* v. *Rowland, supra*, 4 Cal.4th at p. 274.)

■ In reversing defendant's convictions, the Court of Appeal cited various instances of what it believed to be prosecutorial misconduct during rebuttal argument. Many of these incidents should have been disregarded on procedural grounds because defense counsel failed to assign misconduct and request appropriate admonitions. (*People* v. *Rowland, supra*, 4 Cal.4th at p. 274; *People* v. *Price, supra*, 1 Cal.4th at p. 447.) After reviewing the record, we cannot conclude, as did the Court of Appeal, that defense counsel should be excused from objecting based on a reasonable belief that objections would have been futile.

Nonetheless, even if defendant's waivers are ignored, the claims of misconduct must be rejected on the merits. As we shall explain, most of the challenged remarks did not constitute misconduct, and those few comments that were improper did not prejudice defendant.

The Court of Appeal first condemned the prosecutor's comments regarding defense counsel's "lawyering." In his closing argument, defense counsel contended that the prosecutor had not made his case because he failed to call Bouey, the person who forced Wayne to the ground at gunpoint. During rebuttal, the prosecutor contrasted this argument with defense counsel's opening statement, in which he claimed, referring to Bouey, that the prosecutor was going to call "a liar" to testify. After noting that defense counsel

was arguing out of both sides of his mouth,[12] the prosecutor stated, without objection, that this was an example of "great lawyering" which "doesn't change the facts, it just makes them sound good."

The prosecutor then read three classic quotations about lawyers: "[¶] 'Lawyers and painters can soon change white to black. Danish Proverb.' [¶] 'If there were no bad people there would be no good lawyers.' Charles Dickens. [¶] 'There is no better way of exercising the imagination than the study of law. No poet ever interpreted nature as freely as a lawyer interprets truth.' Jean Giraudoux, 1935." Although defense counsel lodged no objection to the above quotations, he successfully objected to the prosecutor's fourth quotation: " 'You're an attorney. It's your duty to lie, conceal and distort everything and slander everybody.' " The trial court admonished the jury: "I will sustain the objection to the reference to the attorney's duty to lie. An attorney is an officer of a court. It would be entirely inappropriate and a violation of their ethical standards and duties to the court to lie in court." After this admonishment, the prosecutor read one last quotation by Shakespeare: "In law, what plea so tainted and corrupt but being seasoned with a gracious voice, obscures the show of evil." Defense counsel did not object.

The Court of Appeal disapproved of the trial court's admonition on the ground that it "impliedly approved the claims that lawyers change black to white, represent bad people, interpret the truth loosely, and have a duty to conceal, distort and slander." We cannot agree.

As to the "lawyering" comments and four of the five quotations, defendant's failure to object waives the issue on appeal. (*People* v. *Rowland, supra,* 4 Cal.4th at p. 274; *People* v. *Price, supra,* 1 Cal.4th at p. 447.) But even if the merits of the misconduct claim are considered, no impropriety appears in this case. Taken in context, the prosecutor's remarks simply pointed out that attorneys are schooled in the art of persuasion; they did not improperly imply that defense counsel was lying.[13] With regard to the prosecutor's fourth quotation, we agree that it constituted improper argument, even

---

[12]The prosecutor argued: "So ladies and gentlemen, when somebody tells you they can't make their case because of Bouey, and then out of the same mouth they told you two weeks ago that Bouey is coming in here and Bouey's a liar and Bouey is no good and how could you believe him, how can you believe what you're hearing?"

[13]Relying upon *People* v. *Hawthorne* (1992) 4 Cal.4th 43 [14 Cal.Rptr.2d 133, 841 P.2d 118], Justice Kennard concludes that the prosecutor committed misconduct in reading the unobjected-to quotations. (Conc. & dis. opn., *post,* at pp. 1225-1228.) We are not persuaded. In *People* v. *Hawthorne, supra,* the prosecutor pointedly argued that, while the state was obligated to present the truth and to make sure no innocent person was convicted, defense counsel was expected and permitted by law to disregard the truth in defense of his client. (4 Cal.4th at pp. 59-60, fn. 8.) Those comments were clearly objectionable because they suggested that counsel was obligated or permitted to present a defense dishonestly. (See *People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].) Here, however, the

though it was directed at attorneys generally, and thus to the prosecutor himself as well as defense counsel. Nonetheless, the trial court's prompt admonishment adequately corrected any misconceptions that could have been conveyed to the jury.[14]

The Court of Appeal found further misconduct when, after commenting on the differences between defense counsel's opening statement and the evidence actually presented at trial, the prosecutor was allowed to say over defense objection: "[Defense counsel]'s just doing his job. His job is to to [*sic*] get him off." The court also found fault with the following statements which drew no objection: "And [defense counsel] tried to imply to you that we could call Mr. Gal when he knew better. Defense counsel knew we couldn't. [¶] But why does he have to stretch? Why does he have to do lawyering?" We are not persuaded.

In *People* v. *Bell, supra,* 49 Cal.3d 502, we concluded that comments similar to those here were not necessarily improper. In that case, the prosecutor argued: " 'It's a very common thing to expect the defense to focus on areas which tend to confuse. That is—and that's all right, because that's [defense counsel's] job. If you're confused and you're sidetracked, then you won't be able to bring in a verdict.' . . . 'It's his job to throw sand in your eyes, and he does a good job of it, but bear in mind at all times, and consider what [defense counsel has] said, that it's his job to get this man off. He wants to confuse you.' " (49 Cal.3d at p. 538.) After noting that the prosecutor had acknowledged that defense counsel's comments were proper and that he was just doing his job, we found that the challenged remarks were appropriate as "a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom." (*Ibid.*) We also concluded, however, that "to the extent that the remarks might be understood to suggest that counsel was obligated or permitted to present a defense dishonestly, the argument was improper." (*Ibid.*) Nonetheless, we rejected the claim of misconduct: "Had counsel believed the jury might misunderstand the prosecutor's meaning, . . . an objection should have been made, and the misleading aspect of the argument

---

quotations did not seek to distinguish between the roles of the prosecutor and defense counsel and did not imply that counsel was offering a dishonest defense. In the context of this case, we are satisfied that the remarks properly served to remind the jury to focus on the relevant evidence and to not be swayed by argument alone. (*Ibid.*)

[14]Defense counsel's failure to request clarification or elaboration of the court's admonishment supports our view that the jury, in hearing the admonishment, would have reasonably understood it to apply to the fourth quotation in its entirety, including the reference to concealing, distorting and slandering.

regarding counsel's responsibility could have been cured by admonition. No objection was made." (*Ibid.*)

In this case, the prosecutor's comments were comparable to, though far milder than, the remarks in *People* v. *Bell, supra,* 49 Cal.3d at page 538. Here, as there, the challenged comments could properly be understood as a reminder to the jury that it should not be distracted from the relevant evidence. Moreover, while defense counsel here actually objected to at least one of the prosecutor's comments, he did not do so on the basis that it could be misunderstood to suggest an improper meaning.[15] Consistent with our reasoning in *People* v. *Bell, supra,* we conclude that the prosecutor's remarks did not exceed the bounds of permissible vigor. (See also *People* v. *Breaux* (1991) 1 Cal.4th 281, 305 [3 Cal.Rptr.2d 81, 821 P.2d 585] [no misconduct to refer to law school trial tactics class where students are taught that if they do not have either the law or the facts on their side, " 'try to create some sort of a confusion with regard to the case because any confusion at all is to the benefit of the defense' "]; *People* v. *Goldberg* (1984) 161 Cal.App.3d 170, 190 [207 Cal.Rptr. 431] [no misconduct to argue defense counsel's job was to confuse the jury on the issues and sidetrack the jury's deliberations].)

The Court of Appeal also observed that the prosecutor had a disagreeable habit of referring to defense counsel's objections as "screaming" or "yelling." The record shows that the prosecutor did this several times, and that defense counsel objected to some, but not all, of these references. For instance, after an objection to an argument was properly overruled, the prosecutor remarked: "He can scream until he's blue in the face, but the evidence is the evidence." This remark drew no objection. Another time, after a different defense objection was properly overruled, the prosecutor commented: "You scream when you get hurt. And this evidence hurts. He can yell all he wants, ladies and gentlemen, but it's not right, it's not fair what he's doing." This time, defense counsel objected and said: "I'm not screaming" and "I am entitled to object when I think it's appropriate. I am not misbehaving by objecting." This latter incident led the trial court to criticize both sides for making speeches while objecting and for not directing their comments to the court. The matter concluded with the court ultimately overruling defense counsel's objection that the prosecutor's comments were improper.

While we do not endorse the cited conduct, it did not render the trial fundamentally unfair. Nor did it amount to a deceptive or reprehensible method of persuasion. Accordingly, it did not constitute misconduct under

---

[15]Defense counsel objected to the phrase "get him off" as improper, arguing only: "He's not on anything. He's on trial."

federal or state standards. (*Donnelly* v. *DeChristoforo, supra,* 416 U.S. at pp. 642-643 [40 L.Ed.2d at pp. 436-437]; *People* v. *Espinoza, supra,* 3 Cal.4th at p. 820.)

Additionally, the Court of Appeal criticized the prosecutor's request that the jury not treat defendant differently from any other defendant because he was able to afford a nationally known attorney,[16] as well as the prosecutor's assertion that defense counsel bullied witnesses.[17] The court's criticisms, we conclude, were unjustified. The challenged remarks, both of which were made without objection, did not insinuate that defense counsel engaged in deceptive tactics. And contrary to the court's opinion, the remarks did not suggest to the jury that it penalize defendant for retaining a nationally known attorney. No misconduct appears.

The Court of Appeal also found that, notwithstanding the lack of an objection, the prosecutor improperly and prejudicially appealed to religious principles by quoting from the Book of Proverbs, chapter 24. (See *People* v. *Wash* (1993) 6 Cal.4th 215, 260-261 [24 Cal.Rptr.2d 421, 861 P.2d 1107] [prosecutor invoked Bible to demonstrate legitimacy of capital judgment and improperly implied that defendant deserved death under God's law].) We cannot agree.

In the first place, it is doubtful that the prosecutor's quotation was improper. (See fn. 18, *post.*) The comments were rather brief and did not appear calculated to appeal to the jury's religious passions or prejudices. (See *People* v. *Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221] [rejecting claim of misconduct involving prosecutor's brief and neutral quotation from Book of Exodus].) In any event, even if it is assumed that the comments were improper, they did not serve to " 'diminish the jury's sense of responsibility for its verdict and . . . imply that another, higher law should be applied . . . , displacing the law in the court's instructions.' " (*People* v. *Wash, supra,* 6 Cal.4th at p. 261, quoting *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].) Viewed in context, the prosecutor's reading of the passage simply served to

---

[16]The prosecutor argued: "And the question you have to ask yourself is this. Would justice be served if somebody who had the resources, the lawyers, everything it takes to put on this type of a case, would justice be served if he got better treatment than any other man that sat in that chair? [¶] It's a right, and he has a right to have a lawyer like Bruce Cutler in here. But is it justice served that you treat him differently simply because he does? And I'm not suggesting that you will. But ladies and gentlemen, please go back to the evidence."

[17]The prosecutor said: "Well, I'm going to submit this to you, ladies and gentlemen. Everybody has a different style in the courtroom. I'm sure outside of the courtroom we are all different. But one of counsel's style [*sic*] is to bully when he's in here with witnesses. And it's his right. He is representing his client. But when you bully, you bully the weak. Kris Foss was a weak person. We know that just from some of her admissions."

redirect the jury's attention to the evidence and its duty to convict or acquit defendant based on that evidence.[18] Thus, "[t]here is no possibility that the jury would have reached a more favorable verdict had the perceived misconduct not occurred." (*People* v. *Wash, supra,* 6 Cal.4th at p. 261.)

Finally, defendant, like the Court of Appeal, claims that all of the aforementioned conduct, when considered together, constituted misconduct in the nature of that censured in cases such as *People* v. *Herring* (1993) 20 Cal.App.4th 1066 [25 Cal.Rptr.2d 213] and *People* v. *Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564]. On the contrary, both of those cases reflected extreme instances of prosecutorial misconduct. In *People* v. *Herring, supra,* the prosecutor argued: " '[m]y people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth . . . .' " (20 Cal.App.4th at p. 1075.) In effect, the argument accused defense counsel of suborning perjury and implied that defense counsel did not believe his own client. It also implied that all those accused of crimes whom defense counsel represented were necessarily guilty of heinous crimes. (20 Cal.App.4th at pp. 1075-1077.) Similarly, in *People* v. *Bain, supra,* the prosecutor not only asserted that defendant and his counsel had fabricated a defense, but he also attacked the integrity of counsel and the

---

[18]The prosecutor argued as follows: "[¶] And finally, let me say this. Counsel told you yesterday, he said—you know, and it's true. I want to be real with you also. I want to tell you look, I want you to do what's fair and just here, regardless of what you think of me, regardless of—just on the evidence. I want you to think long and hard. Because if this is a railroad job against him, then acquit him. Because if the cops and the D.A. and the witnesses have gotten together and done some of this stuff that's been suggested, then he should be acquitted. If you think that I'm pulling punches, hold it against me and acquit him. [¶] But if it's not, if it is not, if there is evidence, if you look at that evidence and you say hey, I think that the evidence is there, if after looking at that evidence—I ask you this. Would it be fair or would justice be served for you to say not guilty to a guy simply because he has all the right titles and all the right lawyers and all the right resources, and yet if the evidence says that he did this cowardly deed, then that would be wrong. [¶] You know, since counsel referred us to biblical characters [this comment apparently referred to defense counsel's accusation that John Lueck was a Judas because he lied], I would like to refer you to a passage from not the New Testament that he quoted, but the Old Testament. It's the Book of Proverbs. [¶] In the Book of Proverbs, chapter 24, it says as follows: [¶] 'That these are the sayings of wise men. It is wrong to sentence the poor and let the rich go free. Whoever says to the truly guilty you are innocent, peoples will curse him and nations denounce him. It will go well with those who convict the guilty and blessing will follow them.' [¶] Ladies and gentlemen, if he's railroaded, acquit him. But if he's not, if the evidence is there, be forthright to go through that evidence. This evidence is probative of what occurred, ladies and gentlemen. Don't let words and rhetoric get in the way of what the evidence is. [¶] I suggest to you if you find the evidence to be true, then don't let the defendant believe that he can get away with this. Don't condone what might have been done based on this evidence. [¶] I say might, I believe the evidence is there, ladies and gentlemen. You make that finding. That's why we have a jury. Let the defendant know that you won't be swayed by antics, rhetoric, whatever. That you can appreciate it, you can be entertained by it, but you can also say nope. The evidence tells me otherwise."

office of the public defender. Additionally, the prosecutor referred repeatedly to racial matters, stating at one point that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty. (5 Cal.3d at pp. 845-846.)

The instant case bears no resemblance to those decisions. We have reviewed a videotape of the closing arguments, and conclude that, taken in context, nearly all of the challenged remarks properly served to remind the jury of its duty to render a decision based on the evidence and nothing else. Furthermore, any possible misleading effect of the one clearly improper remark—i.e., the quotation referring to the duty of an attorney to lie, conceal, distort and slander—was adequately addressed by the trial court's admonitions. Accordingly, the Court of Appeal erred in reversing defendant's convictions on the basis of the conduct addressed above.[19]

## III. DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter is remanded to that court for further proceedings not inconsistent with this opinion.

Lucas, C. J., Arabian, J., George, J., and Werdegar, J., concurred.

**KENNARD, J., Concurring and Dissenting.**—I join the majority in reversing the judgment of the Court of Appeal. I write separately, however, to voice my disagreement with certain portions of the majority's analysis of each of the two issues in this case.

The first issue concerns the admissibility of a conversation between defendant and a lawyer acquaintance, John Lueck, at defendant's home, in the course of which defendant made inculpatory statements. The majority upholds the trial court's ruling that *none* of the conversation was protected by the attorney-client privilege. I disagree. Although the inculpatory statements themselves were not privileged, the privilege did apply to other portions of defendant's conversation with Lueck.

The second issue involves defendant's allegation that the prosecutor engaged in misconduct during his final argument to the jury. The majority concludes that the prosecutor's argument was, in general, permissible. In the

---

[19]We note that defendant's brief on the merits contends that the prosecutor committed numerous other instances of misconduct, many of which were unobjected to, that were not mentioned in the Court of Appeal's opinion. We decline to consider these contentions since they were not raised in the People's petition for review or properly presented in defendant's answer to the petition. (Cal. Rules of Court, rules 28(e)(2), (e)(5), 29.3(c).)

course of its discussion, the majority observes that the prosecutor was entitled to recite to the jury a series of quotations implying that lawyers lie. I disagree. It was defendant, not his lawyer, who was on trial. Comments criticizing the legal profession generally perform no legitimate function in argument to the jury; they simply play upon the deep-rooted distrust that many persons feel for lawyers, thereby distracting jurors from their duty to determine guilt or innocence based on the law and the evidence presented. In a recent decision, we chastised the prosecutor for engaging in such conduct; we should do the same here. I agree with the majority, however, that defendant may not now challenge the prosecutor's conduct because of defendant's failure to object to it at trial.

I

Defendant was charged with hiring two men who brutally attacked his former wife, Aissa Marie Wayne, and her friend, Roger Luby. At trial, the prosecution introduced evidence of a conversation between defendant, a physician, and John Lueck, an attorney who frequently referred his clients to defendant for medical evaluations.

According to Lueck, defendant telephoned Lueck in the spring of 1987, a year and a half before the attack on Wayne and Luby, saying that Wayne had served him with divorce papers and he needed someone to talk to. Lueck agreed to come to defendant's home, but he said he would not represent defendant in any divorce proceedings because of his acquaintance with Wayne as well as defendant.

Upon his arrival at defendant's house, Lueck found defendant tearful and angry. Showing Lueck some holes in the wall, defendant remarked that the altercation between defendant and Wayne that caused the holes was "nothing" compared to what he was capable of doing, and that Wayne had "no idea" how easy it would be for him to pay somebody to "really take care of her." Lueck observed that if anything did happen to Wayne, defendant would be the obvious suspect. Defendant replied that he was "too smart to do something like that" at a time when suspicion would focus on him, and that if he was going to do anything to Wayne he would wait for an opportune time. He added that if he had to leave the country, he would stay with friends in Greece.

Defendant also showed Lueck a declaration by Wayne in support of a request for an "Order to Show Cause." Pointing out that his wife was the daughter of John Wayne, the late actor and a former resident of Orange County (which had named its airport after him) defendant inquired into the

advisability of asking the trial court to transfer the case from Orange County to Los Angeles County. Lueck responded that a motion for change of venue might be appropriate, but he did not offer to take on the task. Instead, he told defendant to get himself a good lawyer right away.

Four months later, defendant, who had retained another lawyer to represent him in the dissolution, asked Lueck to make an emergency appearance in the case on his behalf. Lueck did so, and defendant paid him $750.

Defendant argues that the trial court should have sustained his objection to Attorney Lueck's testimony regarding the conversation at defendant's home, on the ground that the conversation was protected by the attorney-client privilege. The majority upholds the trial court's ruling that *none* of defendant's conversation with Lueck was protected by the privilege. I disagree. As I shall explain, certain portions of defendant's conversation with Attorney Lueck were indeed protected by the attorney-client privilege; nevertheless, because the inculpatory statements in that conversation were not privileged, the trial court's erroneous conclusion that the entire conversation was not protected by the privilege was harmless.

Evidence Code section 952 provides that "information transmitted between a client and his or her lawyer in the course of [their] relationship and in confidence" is protected by the attorney-client privilege. At issue here is whether defendant was a "client" of Attorney Lueck, thus rendering their conversation at defendant's home privileged.

Evidence Code section 951 defines a "client" as a person who "consults a lawyer for the purpose of retaining the lawyer *or* securing advice from him in his professional capacity . . . ." (Italics added.) Here, Lueck had explicitly told defendant before going to defendant's house of his unwillingness to represent defendant in his divorce, because he knew both defendant and his wife. The record contains no evidence that Lueck changed his mind during his visit at defendant's house. Therefore, I agree with the majority that in the conversation at issue defendant was not consulting Lueck for "the purpose of" retaining him. This conclusion, however, does not dispose of the question whether any of defendant's conversation with Lueck was privileged. For Evidence Code section 951 also provides that an attorney-client relationship arises when "a person . . . consults a lawyer for the purpose of . . . securing advice from him in his professional capacity." California cases have not analyzed the meaning of the phrase "professional capacity," as used in Evidence Code section 951, and the majority never directly addresses the issue of whether an attorney-client relationship arose between Lueck and defendant within the meaning of this statutory term.

Most commonly, an individual seeks advice from an attorney in the latter's "professional capacity" upon retaining the attorney for the purpose of representation in court or the performance of other legal services. Here, as I have explained, at the time of the conversation at issue defendant had not retained Attorney Lueck. But Evidence Code section 951 does not limit the creation of an attorney-client relationship to those situations in which the attorney has been retained or retention is under consideration.

The determination whether an individual is seeking advice from an attorney in the attorney's "professional capacity" requires a close analysis of the facts in each case: "In view of the frequency with which some persons seek to obtain informally and gratuitously valuable legal advice, and the lamentable frequency with which attorneys submit to such an imposition . . . , it is often difficult to determine whether the consultation is a professional one, within the privilege. The local habits of life, and the circumstances of the case, must largely determine the ruling." (8 Wigmore, Evidence (McNaughton ed. 1961) Consultation in Attorney's Capacity, § 2303, p. 584, fn. omitted.) Wigmore explains: "[T]he mere circumstance that the advice is given gratuitously does not nullify the privilege." (*Ibid.*, fn. omitted.)

In this case, Attorney Lueck testified that, in response to a specific inquiry by defendant regarding the advisability of asking the trial court to transfer the case from Orange County to Los Angeles County, he told defendant it might be appropriate to do so. In rendering this legal advice, Lueck was acting in his "professional capacity" as an attorney, thus triggering the attorney-client privilege as to this aspect of the conversation.[1]

I now turn to those portions of the conversation in which defendant made inculpatory statements to Lueck. At trial, Lueck testified that during his visit to defendant's home, defendant made these statements: an altercation between defendant and Wayne that resulted in the holes in the wall at the couple's home; the altercation was "nothing" compared to what defendant was capable of doing; Wayne "had no idea" how easy it would be for defendant to pay someone "to really take care of her," defendant was "too smart to do something" to Wayne at a time when suspicion would be drawn to him; and, if defendant were to do something, he would wait for the right time.

None of these inculpatory statements had any bearing on defendant's inquiry of Attorney Lueck regarding the legal advisability of requesting a

---

[1]It is not surprising that Attorney Lueck was willing to give defendant legal advice, even though defendant had not retained him. When asked why he agreed to defendant's request that he examine defendant's divorce papers, Lueck commented that he and defendant had "a business relationship . . . [with] an element of friendship in it. It was the kind of . . . relationship where favors are frequently traded."

change of venue. Nor does the evidence show that defendant made any of these statements while seeking Lueck's professional advice on any other legal matter. The statements were simply blunt observations by defendant that he was capable of, and contemplating the commission of, a violent assault on Wayne, either by himself or by hired thugs. Therefore, the attorney-client privilege did not attach to these inculpatory statements by defendant. As Attorney Lueck stated in a letter to the State Bar (which the trial court considered when it ruled on defendant's assertion that the conversation between Lueck and himself was privileged), the attorney-client privilege "existed for the sole purpose of discussing issues concerning [defendant's] impending divorce and not concerning his expressed intention to hire someone to harm his wife." Accordingly, the trial court properly admitted Lueck's testimony that defendant made each of the inculpatory statements.[2]

Although, for the reasons I have given, the trial court erred in ruling that no part of the conversation between defendant and Attorney Lueck was protected by the attorney-client privilege, I conclude that the privileged portion of the conversation, in which defendant and Lueck discussed the legal advisability of seeking a motion for a change of venue in defendant's divorce case, was irrelevant to the criminal charges in this case. It is therefore not reasonably probable that, absent the error, the outcome of defendant's criminal trial would have been different. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## II

I now consider the issue of prosecutorial misconduct. At the commencement of his rebuttal argument, when defense counsel had no further opportunity to address the jury, the prosecutor told the jury that there was "a difference between evidence and lawyering," and implied that defense counsel's closing argument to the jury fell into the latter category. He first illustrated this difference by reminding the jury of an instance in which

---

[2]In his dissenting opinion, Justice Mosk concludes that Attorney Lueck's role as defendant's friend cannot be separated from his role in providing legal advice to defendant, and that because defendant sought legal advice from Lueck in a *portion* of their conversation, the *entire* conversation is therefore privileged. (Dis. opn., *post*, pp. 1233-1234.) I disagree. Although the policies underlying the attorney-client privilege support "a liberal construction in favor of the exercise of the privilege" (*Benge* v. *Superior Court* (1982) 131 Cal.App.3d 336, 344 [182 Cal.Rptr. 275]), I see nothing in the language of Evidence Code section 951 that would preclude the prosecution's use of inculpatory statements a defendant made to a lawyer in portions of a conversation during which the defendant did not seek the lawyer's professional advice.

defense counsel had made inconsistent arguments.[3] He then mentioned that he had "a Roget's Thesaurus of quotations" containing "famous quotes" about lawyers, and read to the jury these five quotations: (1) "Lawyers and painters can soon change white to black." (2) "If there were no bad people there would be no good lawyers." (3) "There is no better way of exercising the imagination than the study of law. No poet ever interpreted nature as freely as a lawyer interprets truth." (4) "You're an attorney. It's your duty to lie, conceal and distort everything and slander everybody." (The trial court sustained defendant's objection to this quotation.) (5) "In law, what plea so tainted and corrupt but being seasoned with a gracious voice, obscures the show of evil." The prosecutor said that his purpose in reading these quotations to the jury was to show that "throughout the history of time people have recognized the difference between right and wrong, true evidence and lawyering that make things sound flowery."

The majority correctly concludes that because defendant objected only to the fourth of these five quotations, he may not now challenge the remainder. Although this would have disposed of the issue, the majority nevertheless proceeds to consider the comments to which defendant raised no objection, and it finds "no impropriety" in the prosecutor's conduct. (Maj. opn., *ante*, p. 1216.) I disagree. In my view, the prosecutor engaged in misconduct when he interjected these quotations into the trial.

I recognize that attorneys are given wide latitude in closing argument. (*People* v. *Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].) "Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862].) But a closing summation "denigrating counsel instead of the evidence" transgresses the boundary between permissible argument and misconduct. (*Id.* at p. 184.) In this case, the prosecutor crossed that line.

It is well accepted that comments in closing argument disparaging opposing counsel and the legal profession are impermissible: "An attack on the defendant's attorney can be as seriously prejudicial as an attack on the defendant himself, and, in view of the accepted doctrines of legal ethics . . . it is never excusable." (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Prejudicial Remarks Against Counsel, § 2914, p. 3570; see also *People* v.

---

[3]In his opening statement to the jury, defense counsel criticized the prosecutor because the prosecutor planned to call one of Wayne's assailants, a "known liar," to testify against defendant. The prosecutor did not call the assailant to testify, so in closing argument defense counsel criticized the prosecutor for *not* calling him. (I agree with the majority that the prosecutor was entitled to bring this inconsistency to the jury's attention.)

*Sandoval, supra,* 4 Cal.4th at p. 184 ["Personal attacks on opposing counsel are improper and irrelevant to the issues."].)

Recently, this court held that quotations critical of the legal profession have no place in closing argument to the jury. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 60 [14 Cal.Rptr.2d 133, 841 P.2d 118].) In *Hawthorne,* the prosecutor impugned the integrity of defense counsel, in part by quoting from a concurring and dissenting opinion by Justice White in *United States* v. *Wade* (1967) 388 U.S. 218, 256-258 [18 L.Ed.2d 1149, 1174-1175, 87 S.Ct. 1926].[4] We condemned the prosecutor's conduct: "The closing statements of counsel should relate to the law and the facts of the case as each side interprets them. [The quotation] interject[s] an extraneous generalization, potentially diverting the jury's attention from the specifics upon which they must focus." (*People* v. *Hawthorne, supra,* at p. 60.) Here, too, each of the quotations used by the prosecutor interjected "an extraneous generalization, potentially diverting the jury's attention . . . ."

According to the majority, the quotations were appropriate because they "simply pointed out that attorneys are schooled in the art of persuasion; they did not improperly imply that defense counsel was lying." (Maj. opn., *ante,* p. 1216.) But even if the quotations did not accuse counsel of lying,[5] they certainly attacked his integrity. This is what the prosecutor said: Lawyers "change white to black" and "freely" interpret truth, their arguments are

---

[4]This is the full quotation: "Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all, nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but . . . we also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witness to the police, or reveal any confidences of his client, or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth. Undoubtedly there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying. In this respect, as part of our modified adversary system and as part of the duty imposed on the most honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relation to the search for truth." (388 U.S. at pp. 256-258 [18 L.Ed.2d at pp. 1174-1175], fns. omitted.)

[5]As I mentioned earlier, one of the quotations did explicitly state that lawyers have a duty to lie. Defendant, however, successfully objected to this quotation.

"tainted and corrupt," and they use a "gracious voice" to "obscure[] the show of evil." These comments amount to a broadside attack on the integrity of the legal profession, accusing lawyers of hiding the truth for corrupt purposes.[6]

By asserting that lawyers obscure the truth in an attempt to mislead the jury, the prosecutor strongly implied that defense counsel in this case was behaving in the same manner. (Of course, the prosecutor never mentioned to the jury that the quotations, which attacked the integrity of *all* lawyers, could be applied to himself as well as to defense counsel.) As one federal court stated recently: "[C]omments by prosecutors to the effect that a defense attorney's job is to mislead the jury in order to garner an acquittal for his client [are] not only distasteful but border[] on being unethical. See ABA Code of Prof. Resp. EC 7-10, 7-37. Such comments only serve to denigrate the legal profession in the eyes of the jury and, consequently, the public at large. . . . [Such comments] should not be tolerated by either the trial judge or the bar." (*U.S.* v. *Linn* (10th Cir. 1994) 31 F.3d 987, 993.)

True, one of the prosecutor's quotations in this case—"If there were no bad people there would be no good lawyers"—did not directly attack the legal profession. Rather, it attacked defendant himself, implying to the jury that if defendant was innocent he would not have had to hire a good lawyer. In other words, the better the lawyer, the greater the likelihood of the client's guilt. I find this observation by the prosecutor just as reprehensible as the other comments I have discussed.

Unlike the majority, I would conclude that the prosecutor committed misconduct when he recited the quotations concerning lawyers to the jury.[7] Defendant, however, objected to only one of the quotations, and the trial court sustained the objection. Because any prejudice resulting from the prosecutor's use of the other quotations could have been cured by a timely objection by defendant and an admonition by the court to the jury to disregard the comment, defendant is barred from now challenging the prosecutor's conduct. (*People* v. *Price* (1991) 1 Cal.4th 324, 440 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

CONCLUSION

A trial should not be a duel between attorneys, but a search for truth. An attorney's closing argument should therefore focus on the applicable law and

---

[6]The majority concludes that the prosecutor's comments "did not imply that counsel was offering a dishonest defense." (Maj. opn., *ante*, p. 1217, fn. 13.) It is difficult to reconcile this conclusion with the language of the quotations set forth above, and the majority makes no attempt to do so.

[7]Defendant also argues that other comments by the prosecutor constituted misconduct. I agree with the majority that "most of the challenged remarks did not constitute misconduct, and those few comments that were improper did not prejudice defendant." (Maj. opn., *ante*, p. 1215.)

on the evidence presented. It should not discuss the qualities of opposing counsel; still less should it denigrate the legal profession in general. Such conduct serves only to interject extraneous material into the trial, "potentially diverting the jury's attention" from its task to apply the law to what it determines to be the true facts. (*People* v. *Hawthorne*, *supra*, 4 Cal.4th at p. 60.)

Here, the prosecutor's use, in closing argument to the jury, of comments impugning the integrity of the legal profession in general, and by inference the integrity of the defense attorney in particular, was improper. By condoning the use of such comments, the majority implicitly furthers the public's deep-rooted suspicion and distrust of lawyers.

**MOSK, J.,** Dissenting.—I agree with Justice Kennard for the reasons stated in her concurring and dissenting opinion that the prosecutor engaged in misconduct during portions of his rebuttal argument by attempting to place defense counsel and the legal profession on trial in order to advance his own legal strategy. This hypocritical maneuver placed before the jury matters that were irrelevant, and that were designed to subtly undermine the adversarial process by turning defense counsel's advocacy against the defendant. A timely objection to these remarks should have been sustained. I also agree with Justice Kennard, however, that absent an objection we cannot find the prosecutor's improper remarks were prejudicial.

I dissent from the majority and from Justice Kennard on the question of the admission of John Lueck's testimony. The record in this case, despite Lueck's and the majority's self-serving characterization, shows that defendant consulted Lueck primarily in the latter's capacity as an attorney, and that any statements made by defendant during the course of the consultation were privileged. The admission of this testimony over defendant's objection was prejudicial error.

To determine whether defendant's statements made during his meeting with Lueck were privileged, a review of fundamental principles is in order. First, "The basic policy behind the attorney-client privilege is to promote the relationship between attorney and client by safeguarding the confidential disclosures of the client and the advice given by the attorney. This policy supports a liberal construction in favor of the exercise of the privilege." (*Benge* v. *Superior Court* (1982) 131 Cal.App.3d 336, 344 [182 Cal.Rptr. 275].)

Second, Evidence Code section 951 defines a "client" under the attorney-client privilege as "a person who, directly or through an authorized representative, consults a lawyer for the purposes of retaining the lawyer *or* securing legal service or advice from him in his professional capacity

. . . ." (Italics added.) The section's definition of client is thus, as Justice Kennard points out, two-pronged: a client is one who consults a lawyer either (1) for the purpose of retaining the lawyer, or (2) for the purpose of securing legal service and advice in the lawyer's professional capacity.

The majority conveniently ignore this second prong of Evidence Code section 951. They therefore reason that the question whether there is an attorney-client privilege turns on Lueck's refusal to be retained by defendant in his pending divorce action. Yet the existence of the privilege does not depend on whether an attorney accepts or refuses employment, but rather "hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek legal advice." (1 McCormick on Evidence (4th ed. 1992) § 88, p. 322.) "[A]n attorney may render his services *without charge* if he pleases, and hence the mere circumstance that the advice is given gratuitously does not nullify the privilege." (8 Wigmore, Evidence (McNaughton ed. 1961) § 2302, p. 584, italics in original.) Even if defendant could not have reasonably believed that he was consulting an attorney for the purpose of retaining him, he could still have reasonably intended to consult with him for the purpose of securing legal advice from Lueck in the latter's "professional capacity." As the record reveals, such was in fact the case.

Although Lueck attempted to give his own self-justifying account of what happened between him and defendant, the facts of this case speak for themselves. According to the attorney's own testimony at defendant's bail hearing, his relationship with defendant was more one of business than of personal friendship. He referred some of his clients to defendant. As he stated: "It was the kind of relationship *where favors are frequently traded.*" Lueck strongly suggested in the bail hearing testimony that he was providing defendant with a free legal consultation in exchange for services defendant had previously rendered him. As he stated in reference to defendant's request to meet with him on the occasion in question: "I didn't feel imposed on at that point because there were many times that I had asked him for" help of an unspecified type.

Defendant called Lueck immediately after having been served with his divorce papers in the spring of 1987, some 18 months before the crimes with which defendant was charged occurred. Lueck agreed to come to defendant's house, although he reiterated what he had made clear on a previous occasion—that he would not represent defendant in the divorce. He testified that once he arrived at defendant's house, defendant "showed me the [divorce] papers and we had a discussion about it." He read portions of these papers, particularly the declaration in support of his then-wife Aissa Wayne's order to show cause. The declaration alleged that defendant had committed various

acts of violence against Wayne. Lueck asked defendant if the matters alleged in the declaration were true. Defendant replied, according to Lueck, that they were. Lueck advised defendant to obtain other counsel promptly. Defendant inquired whether a change of venue would be appropriate and Lueck replied that it would be. Defendant then made a number of inculpatory statements referred to by the majority about his ability to hire people to "take care of" his wife and showed Lueck holes in the walls of his house that supposedly demonstrated his capacity for violence.

Several months later, Lueck represented defendant in an ex parte proceeding to expand his visitation rights with his daughter, for which he was paid $750. This was, of course, a variation of defendant's conflict with his estranged wife.

The picture that emerges from this record is different from the one that Lueck, or the majority, would have us believe. As was pointed out in the Court of Appeal's decision below, it is obvious that defendant did not call on Lueck because he needed a good friend in whom to confide: by Lueck's own admission, he and defendant did not have that kind of close relationship. It is, rather, evident that from defendant's perspective the predominant reason he asked Lueck to come to his house was to review, and to give advice on, the legal papers with which he had just been served. Above and beyond any of the specific questions defendant asked about change of venue and the like, he was plainly inquiring in an open-ended manner for Lueck's opinion, as a lawyer, of those legal documents. And defendant had a reasonable expectation that the lawyer would render gratuitous legal advice, despite the latter's refusal of employment, because their relationship "was the kind . . . where favors are frequently traded."

The nature of the relationship between defendant and Lueck is further illuminated by the latter's consent to represent defendant in an ex parte court appearance some four months later. Due to the absence of defendant's regular attorney, and the urgent nature of his claim for expanded visitation rights in connection with his daughter's baptism, he asked Lueck to substitute for his regular attorney. On this occasion, defendant called on the attorney to do more than engage in an informal consultation: Lueck drafted the necessary papers and made the ex parte appearance, for which he was paid. But their relationship at that time was fundamentally as it was on the prior occasion: defendant looked to Lueck for emergency legal assistance, and received it from him. Whether formally hired or not, it is clear that defendant viewed Lueck not as his regular counsel but as a lawyer to whom he could turn in times of crisis for legal service and advice.

This case is similar in many respects to *People* v. *Fentress* (1980) 103 Misc.2d 179 [425 N.Y.S.2d 485]. In that case the defendant, a high school

teacher, was a friend and former teacher of Schwartz, an attorney with a noncriminal practice. After graduating from law school, Schwartz gave his new business card to the defendant and told him to call at any time. The defendant eventually did call Schwartz, confessing to him that he had murdered someone and that he was contemplating suicide. Schwartz counseled the defendant against suicide. He suggested various persons who might also be able to help him, including a rabbi. He also told the defendant that the police should be called, and the defendant agreed. Eventually, the defendant phoned Schwartz's mother, also a friend, who called the police. (*Id.* at pp. 489-490.) Schwartz did not represent the defendant in subsequent criminal proceedings.

The court, in assessing the defendant's claim that his statements to Schwartz were protected by the attorney-client privilege, concluded the defendant had in fact consulted with Schwartz in the latter's professional capacity as a lawyer. As the court explained: "Under any view, the defendant and . . . Schwartz were friends. And while there would be no privilege if . . . Schwartz was acting solely as a friend, abjuring professional involvement [citation], it may be inferred that the defendant communicated with . . . Schwartz because he was not only a friend but an attorney, from whom he was seeking support, advice and guidance. That . . . Schwartz was called upon to serve as psychologist, therapist, counselor, and friend does not derogate from his role as lawyer." (425 N.Y.S.2d at p. 492.) The court also found that the defendant told the police on several occasions after being apprehended that Schwartz was his attorney, "indicative of his own subjective belief that he contacted his friend, . . . Schwartz, qua attorney." (*Ibid.*) The court nonetheless found that the defendant in this instance did not intend to keep his communication to Schwartz about the crime confidential, as evidenced by the fact that he agreed to allow Schwartz to call the police. (*Id.* at pp. 493-494.)

In this case as in *Fentress*, defendant had good reason to believe that Lueck, although his friend, acted primarily as a lawyer whom he called for help and advice in a situation of emergency. Even more than in *Fentress*, the discussion here between defendant and attorney revolved around legal matters—the divorce papers with which defendant had been recently served. There was also less of a friendship and far more of a professional relationship here than in *Fentress*. And unlike in *Fentress*, nothing that defendant said during his meeting with Lueck or subsequently indicated that he intended any of his statements to be anything but confidential.

The cases cited by the majority for the proposition that no attorney-client privilege applies after an attorney declines employment are readily distinguishable. In *State* v. *Hansen* (1993) 122 Wn.2d 712 [862 P.2d 117,

121-122], the defendant called an attorney chosen from a list provided by the local lawyer referral service. A short way into their telephone conversation, the attorney made clear to the caller, a complete stranger, that he would be unable to take the case and that the defendant might want to seek another attorney with more experience in criminal law. After that communication, the defendant continued talking to the attorney and made a number of self-incriminating statements. The Washington Supreme Court held that the defendant had no reasonable basis for believing that an attorney-client relationship had been formed. (*Id.* at p. 121.) In the present case, unlike *Hansen*, the attendant circumstances gave defendant good reason to believe that his friend and business associate Lueck would render gratuitous legal advice, despite his refusal of formal employment; nothing that Lueck said or did disabused defendant of that well-founded belief.

The other cases cited by the majority involve situations in which the attorneys not only refused employment, but made clear that they represented a client or interest that was *adverse* to the parties attempting to assert the privilege. (See *United States* v. *Dennis* (2d Cir. 1988) 843 F.2d 652, 657; *McGrede* v. *Rembert Nat. Bank* (Tex.Civ.App. 1941) 147 S.W.2d 580, 584; *Farley* v. *Peebles* (1897) 50 Neb. 723 [70 N.W. 231, 233].) In such cases, it is surely unreasonable to believe that statements made to an attorney who represents a conflicting interest are protected by the attorney-client privilege. In this case, Lueck never claimed to be representing an adverse party and, as explained above, defendant reasonably believed that Lueck would function, and Lueck did in fact function, as his ad hoc legal consultant. He was therefore a "client" consulting with Lueck to "secure legal service or advice" within the meaning of Evidence Code section 951.

Nor do I agree with the concurring and dissenting opinion herein that Lueck's role as legal adviser and as friend can or should be separated once it is established that an attorney-client relationship existed between them on the occasion in question. There is no basis either in precedent or policy for making such a separation. Indeed, an attorney is often called upon to listen to client communications that are not strictly law-related. As one commentary has stated: "It must often occur to the lawyer as he listens to his client's problems that the client is less interested in legal redress than he is in purging himself emotionally by telling 'his side of the story' and using the lawyer as sounding board and general counselor. One could argue that these communications should not be protected by the attorney-client privilege because not made to a 'professional legal adviser in his capacity as such.' Frequently, however, client and lawyer would be unable to distinguish between personal and legal matters." (Note, *Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the Privileged Communications Doctrine* (1962) 71 Yale L.J. 1226, 1251.) This inextricable connection between the attorney's role as legal adviser and his role as "sounding

board and general counselor" is nowhere more true than in the area of family law, the subject on which defendant consulted Lueck, where legal issues are often also deeply personal. (See *Privileged Communications, supra,* 71 Yale L.J. at p. 1252, fn. 175.)

For this reason, courts do not distinguish between privileged and nonprivileged communications between an attorney and a client made in the same consultation, except perhaps when it is manifest that the client intended certain communications to be nonconfidential, as when he or she makes the same or similar communications to a third party (see *Solon* v. *Lichtenstein* (1952) 39 Cal.2d 75, 80 [244 P.2d 907]), or when the statement falls within one of the statutory exceptions to the privilege (see Evid. Code, § 956). A crabbed view of the attorney-client privilege that would differentiate between privileged and nonprivileged statements according to whether the statements contained the requisite "legal content" would impossibly burden the free flow of communication between lawyer and client that the privilege is designed to promote. (See *Benge* v. *Superior Court, supra,* 131 Cal.App.3d at p. 344.) The fact that defendant consulted Lueck not only as a lawyer, but also as a sympathetic listener, does not allow us to gerrymander the attorney-client privilege to exclude from evidence defendant's questions regarding the advisability of change of venue, but allow testimony of his outbursts of anger at his ex-wife.

In sum, the majority and the concurrence fail to recognize that the May or June 1987 meeting between Lueck and defendant was primarily a legal consultation, and that the statements made therein were protected by the attorney-client privilege, notwithstanding Lueck's refusal to represent defendant or the subsequent rationalization of his decision to testify against defendant. I conclude, therefore, that the trial court committed error in permitting Lueck to testify over defendant's objection.

The error was unquestionably prejudicial. This was a close case, as illustrated by the fact that the first jury—which did not have the benefit of Lueck's testimony—deadlocked. Lueck was the principal witness to testify to defendant's intent to hire someone to commit violence against his ex-wife.[1] Lueck's testimony was central to the case, as evidenced by the prosecutor's prolonged and repeated reference to it during closing argument. For example, he stated in his opening summation: "Why [Lueck's testimony] is so important is this: There is an old French expression that says as a man thinks, so he is. In other words, you dwell on something long enough

---

[1]Christine Foss, defendant's former employee, also testified to similar statements defendant had made. But the prosecutor conceded in closing argument that Foss might be viewed by the jury as an unreliable and ineffective witness, and it was plain from the closing argument that the prosecutor depended considerably less on the testimony of Foss than that of Lueck.

whether it's impure thoughts, whether it's violence, whether it's grandiosity, you're going to eventually do it. . . . What does that say about Dr. Gionis? What does that say when a person starts making comments like that . . . . [A]n upset man, an angry man might say 'God, I would like to get her or hate her.' But how many people do you know would say I could hire somebody to do her? . . . [T]hat is very, very probative."

The prosecutor continued: "[The statements to Lueck] occurred . . . right after the breakup [of defendant and Wayne]. And sure it was a year and a half later that [the assault] occurred. But if you're ever going to hear any statement of this man's intent of what he is thinking, you're going to hear it early on because as it gets closer, he's going to be more tight-lipped . . . . But it just shows you what he is capable of, Ladies and Gentlemen, how he thinks of his wife and how it ties into this case. I am not suggesting for you to take this to show he's a person of bad disposition, but that [it] is a unique, unique diabolic thought."

The only other evidence introduced by the prosecution are phone calls and payments between defendant and Gal, who in turn was linked through numerous phone calls to Jeffrey Bouey and Jerrel Hintergardt, the perpetrators of the assault. Defendant argued that his communication and payments to Gal were in connection with legitimate surveillance activity. There was no evidence as to the content of these communications. There is no evidence that defendant ever communicated directly with Bouey and Hintergardt, and considerable room for doubt whether, even assuming that he indirectly hired these two, he intended the eventual violent result. Lueck's testimony allowed the prosecutor to show that defendant did in fact contemplate hiring someone to commit violence against his wife, and the prosecutor emphasized at several points during closing argument that the statements were highly probative. It is reasonably probable that but for Lueck's testimony regarding defendant's state of mind the second jury, like the first, would not have convicted defendant of the charged offenses. The error was therefore prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Because the trial court prejudicially erred in admitting Lueck's testimony over defendant's objection, in contravention of the attorney-client privilege, I would uphold the Court of Appeal's reversal of defendant's conviction.

Appellant's petition for a rehearing was denied July 13, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.