Filed 10/16/15  P. v. Hernandez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>JOSE REDANI HERNANDEZ,<br><br>      Defendant and Appellant. | B253166<br><br>(Los Angeles County<br>Super. Ct. No. BA385638)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 30, 2015, be modified as follows:

On page 29, at the end of footnote 21, after the word "occurred," add the following:

We note that as to each of the claims raised in sections I through VIII of appellant's opening brief, appellant himself proposed and briefed the issue, for purposes of Government Code section 68081, of whether any of those claims were preserved for appellate review.  He did so by arguing in section IX of his brief that the claims in sections I through VIII were preserved for appellate review and "if this Court were to conclude that counsel failed to adequately preserve *any* claim for appeal for *any* reason" (italics added), he was denied effective assistance of counsel.

There is no change in the judgment.

Appellant's petition for rehearing filed on October 15, 2015, is denied.

KITCHING, J\*.                                                    EDMON, P. J

---

\*        Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSE REDANI HERNANDEZ,<br><br>　　　　Defendant and Appellant. | B253166<br><br>(Los Angeles County<br>Super. Ct. No. BA385638) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Jose Redani Hernandez appeals from the judgment entered following his conviction by jury for first degree murder, armed with a firearm. (Pen. Code, §§ 187, 12022, subd. (a)(1).) The court sentenced appellant to prison for 26 years to life. We affirm.

### FACTUAL SUMMARY

1. *People's Evidence.*

The evidence established on September 26, 1995, Liliana Evangelista was the manager of the apartment building at 526 South Oxford in Los Angeles. As Evangelista, en route to the third floor, was ascending a staircase in the building, she saw a man sitting on the staircase. The man partially covered his face with his hand, and appeared to be "covering himself with his cap." Evangelista went to the apartment of Catarino Barrera and asked for his help to show an apartment to a prospective tenant.

As Barrera and Evangelista were going downstairs, they saw the man seated on the stairs between the second and third floor.[1] Appellant was crouching. A few minutes after Barrera and Evangelista passed appellant and arrived on the first floor, there were gunshots. Immediately thereafter, Barrera and Evangelista saw three male Hispanics, including appellant, running down the stairs. Appellant was the third male.

Although there may have been conflicting evidence concerning whether appellant had a gun (see the facts in part 1 of our Discussion, incorporated here by reference), Evangelista at one point testified appellant, wearing a blue baseball cap, was holding a gun in his right hand and bleeding. All three men ran out the building. Evangelista testified appellant was bleeding from his right side. After the three men fled, Barrera and

---

[1]     Appellant conceded during opening statement that he was the man sitting on the stairs and the man whom Evangelista and Barrera saw sitting on the stairs as the latter two descended the stairs. We note, as discussed below, appellant's blood was discovered at the crime scene and leading from it. There is no dispute the man whom Evangelista first saw sitting on the stairs, and the man whom she and Barrera later saw sitting there when the latter two descended the stairs, was appellant. Appellant states, inter alia, "the defense conceded that [appellant] was the male whom Barrera and Evangelista saw sitting on the stairs and running out of the building bleeding . . . ."

Evangelista went upstairs. There were bloodstains along the staircase. Evangelista went to apartment No. 302. The apartment's door was ajar. Amilcar Saravia, mortally wounded, was on the floor inside the apartment. Evangelista called 911 and told the operator three Hispanic suspects were involved in the shooting of Saravia.

In September 1995, Pablo Landino was walking on Fifth towards Oxford. Three men were running. One was behind the other two and his leg was bleeding. The two men conversed with each other, looked back at the third, then waited for him to catch up. The third man was holding his hand near his stomach. Once the third man caught up to the other two, all three entered a car parked on Fifth and drove away.

Los Angeles police went to the apartment building and saw blood spatters on the ground. The blood spatters continued on the floor, wall, and handrail as police entered the building and ascended the stairs. Blood was on the outside of the door and near the doorjamb of apartment No. 302. Saravia's body was on the floor inside the apartment. Saravia had a gunshot wound in his forehead and a gunshot wound in his upper right arm. The blood trail continued outside the building. The blood trail continued to the east sidewalk of Oxford, then north, then east on Fifth, then across the street to the north side of Fifth, where the trail ended. Blood samples collected from the crime scene came from Saravia and appellant. Blood samples on the stairwell, outside the apartment, and on the street belonged to appellant.

A bullet was embedded in the floor under Saravia's body. A bullet had struck the opening edge of the door. The door frame had recent damage caused by a sharp instrument. A criminalist did not find cartridge casings, a fact leading the criminalist to conclude the gun used in the shooting was a revolver. A significant sum of money was under the mattress in apartment No. 302.

Saravia died as a result of a gunshot wound to the forehead. The wound would have been instantly incapacitating, causing Saravia to fall immediately. Because the wound showed no signs of stippling or soot, the shooter must have been at least two feet from Saravia when the shooter fired the gun. The bullet embedded in the floor under Saravia's body was extracted, and that bullet and a bullet recovered from his forehead

3

were fired from the same gun. Saravia suffered a second gunshot wound to his upper-right arm. That wound could have been caused by a shooter standing somewhere below Saravia's feet and pointing the gun slightly downward at him while he was on the floor.

On September 27, 1995, appellant went to the emergency room at Los Angeles County/USC Hospital (hereafter, County). Dr. Kevin Hilton, who later performed surgery on appellant's hand, testified as follows. Appellant stated he had cut his hand with a circular saw about 24 hours before arriving at County. Dying tissue around the wound caused Hilton to conclude the injury most likely had been inflicted at least a day before he saw appellant. The wound did not have jagged edges. The wound was caused by a smooth, very sharp blade, such as a machete, and was not consistent with a wound caused by a circular saw. A copious amount of blood would have spurted from the wound. On September 29, 1995, Hilton performed surgery on appellant's hand.

In May 2011, Los Angeles Police Detective Michael Pelletier and other detectives went to a facility near Bakersfield to contact appellant. Appellant had been identified as a "cold hit" in Saravia's case. After contacting appellant, a detective collected DNA samples from him. Detectives asked appellant if he had any new scars and appellant replied no. However, when appellant was asked to remove his jacket, he immediately said he had a scar on his hand. Appellant claimed he did not know what happened, but acknowledged the wound was caused by a machete.[2]

In August 2011, Ricardo Martinez and appellant conversed while the two were in custody in jail. Martinez knew appellant but had not seen him since 1992. Martinez testified appellant told him the following. Appellant was being held on a 16-year-old murder case. Appellant went to the Beverly Apartments, entered, and had a problem with a male. The male had a machete in his hand and appellant had a gun. Appellant tried to defend himself from the male. Appellant was cut on the hand and his hand bled.

---

[2] During a June 11, 2011 call in jail, appellant told the caller to tell a person named Javier that if "they" asked Javier any questions, Javier was to deny knowing anything. The caller agreed to convey the message. During an August 21, 2011 call, appellant told a caller "they" could not make her say anything.

Appellant shot the male in the torso and the male died. Appellant was by himself when he shot the male. Appellant exited the apartment and came outside, and blood was dripping from his hand. A second male saw appellant leaving with the gun and bleeding. Appellant threw the gun away. Sixteen years later, the second male recognized appellant and was a witness against him.

Martinez testified he voluntarily told law enforcement personnel what appellant had said, and Martinez received no benefit for doing so. However, after disclosing the information, Martinez asked Pelletier if the prosecutor assigned to appellant's case was going to visit Martinez. Martinez did not ask Pelletier to talk to the prosecutor to get a deal for Martinez. Martinez asked nothing from anyone. Pelletier testified Martinez told Pelletier that Martinez would help the prosecutor "from the bottom of [Martinez's] heart," but Pelletier also testified Martinez said, "I hope [the prosecutor] help me a little bit, . . . with this case because this case is bullshit."

2. *Defense Evidence.*

In defense, Ryan O'Connor, a physician specializing in emergency medicine (and a court-appointed expert witness), reviewed appellant's medical records from County generated from September 27, 1995 through October 1, 1995. O'Connor concluded from the records as follows. When appellant arrived at the hospital, he had lacerations on his left hand. He also had bruises near his left eye, on his chest, and on his back, and an abrasion on his chin. The wound to appellant's hand was defensive.

According to the medical records, the wound to appellant's left hand was described as accidental. Appellant told emergency room personnel the injury was from a circular saw. The wound could have been caused by a saw. O'Connor could not determine when appellant received the bruises. O'Connor's understanding a machete had been involved was based on information appellant's trial counsel gave to O'Connor and, based solely on that information, O'Connor opined the wound to appellant's left hand was defensive.

On October 10, 2011, Pelletier interviewed Martinez in jail. Pelletier made it clear to Martinez that Pelletier was not offering anything in exchange for Martinez's statement.

5

Martinez told Pelletier that appellant told Martinez that appellant had left DNA evidence at the scene of the shooting due to a cut appellant had suffered.

## ISSUES

Appellant claims (1) the trial court improperly commented on evidence, (2) the court erroneously failed to admit evidence under Evidence Code section 356, (3) the court erroneously failed to take judicial notice of certain matters, (4) the court erroneously excluded defense exhibits J and K, (5) the prosecutor committed misconduct during jury argument, (6) the court committed instructional error regarding perfect self-defense and imperfect self defense, (7) appellant was denied effective assistance of counsel, and (8) cumulative prejudicial error occurred.

## DISCUSSION

1. *The Court Did Not Improperly Comment on Evidence.*

At trial, Barrera testified during direct examination he saw the three men run down the stairs and out the building. The prosecutor asked what Barrera noticed in the hands of each of the three, and Barrera replied, "[t]hey were holding weapons." The court asked, "[a]ll of them or just some of them?" Barrera later testified the first man and the last man running out the building were holding handguns. The person whom Barrera had seen sitting on the stairs was one of the three who ran out the building while holding a gun, and that person was holding the gun in his right hand. When Barrera first saw the person, the person was crouching. Barrera demonstrated and the court stated Barrera "leaned forward in his chair, drawing his head closer to his lap." During cross-examination, Barrera testified that, at the preliminary hearing, he denied having seen "anyone carrying a handgun as they were running down the stairs after the shooting."

During redirect examination, Barrera testified as follows. Prior to the preliminary hearing, Barrera told a detective all three men running down the stairs and out the building had handguns, and one of the three was the man whom Barrera initially had seen sitting on the stairs. Barrera also told a detective substantially the same thing earlier on the day Barrera was testifying at trial.

6

At trial, Evangelista testified as follows during direct examination. When the three men ran out the building, the last one had a gun in his hand. This was the same man who had been sitting on the staircase and the same man who was bleeding. He was wearing a baseball cap. She did not notice whether either of the other two men had a gun. Her memory when she spoke to the detective was better than her memory at time of trial. On the day of the incident, Evangelista told a detective two of the three men running down the stairs and out the building had handguns.

Later during direct examination, Evangelista testified three men were running in line out the building and she could not remember which two had the handguns. The man on the stairs before the shooting was wearing a cap, and was the third man later coming down the stairs. The following then occurred: "[The Prosecutor:] Q . . . Now, can you recall whether when you saw the men running out the building with two of them having handguns, whether any of the men carrying a handgun was wearing a cap? [¶] The Court: Counsel, we covered this yesterday. The state of the testimony is that the third person running down the stairs, who was injured, had a cap on and had a gun on him." The prosecutor indicated she had no further questions.[3]

Appellant claims the trial court's "state of the testimony" comment was improper. He concedes that (consistent with the trial court's comment) Evangelista testified at one point during her direct examination that the third person coming down the stairs was injured and had a cap and gun. However, appellant argues Evangelista gave conflicting testimony on whether the third person had a gun; therefore, the court's comment focused on testimony favorable to the People and not subjected to cross-examination. Appellant also argues the jury may have understood the court to be commenting on Barrera's

---

[3]     During cross-examination (and thus after the court's challenged "state of the testimony" comment), Evangelista testified to the effect when she spoke to police officers in 1995, she said the first man she saw was holding a gun; she told the detective in 1995 she "had seen the men, that they were coming with their guns"; she told the detective the second man had a gun; she told the detective a third man (the one who had been sitting on the staircase) ran by; and she did not remember whether, when she spoke to the detective in 1995, she told him the third man had a gun.

7

testimony as well. Appellant maintains the comment was an inaccurate summation of the record and impermissibly tended to remove doubt appellant held a gun.

However, appellant waived the issue of whether the trial court's comment was improper by failing to object timely to it. (Cf. *People v. Sanders* (1995) 11 Cal.4th 475, 531.) Even if the issue were not waived, it does not appear the trial court was summarizing the record for the jury, or focusing on testimony of Evangelista favorable to the People and ignoring any conflicting testimony from her. The trial court's comment was simply a comment directed to the prosecutor, precluding her from eliciting cumulative testimony from Evangelista. Evangelista already had testified during direct examination the third person coming down the stairs was injured and had a cap and gun. The court did not, in its comment, expressly refer to Barrera.

Moreover, CALCRIM No. 3550, which the court gave the jury during the final charge, provided evidence of the trial court's intent in making the challenged comment. That instruction told the jury, "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." The court did not, in that instruction, make any exception for the challenged comment. The trial court did not improperly comment on evidence.[4]

---

[4] Neither *People v. Moore* (1974) 40 Cal.App.3d 56 (*Moore*), nor *Forte v. Schiebe* (1956) 145 Cal.App.2d 296 (*Forte*), cited by appellant, compels a contrary conclusion. Unlike the situation in the present case, in *Moore*, the trial court's challenged comments followed the presentation of evidence by both parties, reasonably could be viewed as an effort to summarize the evidence presented by both, and did not involve an admissibility issue. (*Moore*, at pp. 65, 67.) In *Forte*, the trial court made comments, then expressly rejected the defendant's request that the court make any additional comments " 'out of the hearing of the jury.' " (*Forte*, at p. 300.) The court then stated, " '[t]he jury is part of this court.' " (*Ibid.*) The court subsequently repeated the substance of the court's previous comments. (*Ibid.*) That did not occur in this case.

8

2. *The Court Did Not Erroneously Fail To Admit Evidence Under Evidence Code Section 356.*

During trial, appellant called O'Connor out of order as a defense witness and, as mentioned, he reviewed appellant's County medical records. During cross-examination, the prosecutor asked O'Connor a question to the effect if it was true appellant did not seek immediate medical treatment for his wound. O'Connor replied, "According to the statements [appellant] made in the emergency room, he delayed seeking medical attention. I believe it was a day." During redirect examination, appellant's counsel asked O'Connor, "[appellant] didn't seek treatment in the emergency room for a day, but he did seek treatment from someplace else prior to the surgery?" The court posed its own hearsay objection.

Appellant later proffered a portion of a three–page surgical report upon which O'Connor and Hilton had relied, and about which Hilton had testified. The portion reflected that during a conversation about appellant's arm injury, he apparently stated to emergency room personnel that he sought medical treatment elsewhere, his wound was treated, and he was subsequently sent to County. Appellant sought to introduce that statement under Evidence Code section 356. The court excluded the portion pertaining to appellant "having received outside treatment."

Appellant argued the prosecutor had introduced only evidence from medical records, and appellant was proffering a statement in a testifying doctor's report. The court indicated it would have to give a limiting instruction that the jury could use "this" information, not for its truth, but to understand "what body of information this doctor had prior to providing treatment." However, appellant specifically complained the *prosecutor* was trying to introduce, for their truth, statements made to the surgeon that appellant had not sought medical care, and appellant's counsel later argued, "the *People* cannot argue it was received for the truth." (Italics added.)

9

The court replied, "What the *People* can argue is simply that, we do not know whether he went to go some [*sic*] Tylenol on the 26th. We don't know what he did in terms of his injuries. All we do know is that he did not seek the assistance of [County] until 24 hours after [the] incident occurred." (Italics added.) Appellant's counsel replied, "And that's fine. I don't have a problem with that. Exactly what you said, he did not seek medical treatment from [County] until the 27th."[5]

During closing argument, the prosecutor commented, "even though [appellant] was cut to the most severe degree on that hand, he delayed seeking medical care." Later, the prosecutor commented, "So the defendant made sure he didn't seek medical attention on the day of the shooting, even though that was an extremely severe injury. That was by design, to try to avoid detection. . . . [¶] . . . [¶] The only reason for the defendant to delay medical care to that severe wound and to then lie about how he sustained that wound is to avoid detection."[6]

Appellant claims the trial court erroneously refused to admit into evidence, pursuant to Evidence Code section 356,[7] statements by appellant. We disagree. The

---

[5] During its final charge, the court told the jury, "With respect to the medical records reviewed by the surgeon who operated on the defendant at County USC Medical Center, you are to consider the contents of those records solely for the purpose of understanding what information the treating surgeon relied upon, not for establishing the truth of [the] contents of such records."

[6] Appellant asserts the jury deliberated about five-and-one-half hours. During deliberations, the jury asked the court a question concerning the meaning of the word "AND" in such instructions as CALCRIM Nos. 401, 520, and 521, and the court responded. The record does not reflect the jury asked an additional question(s).

[7] Evidence Code section 356 states, in relevant part, "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." The requirement that the remaining statements have some bearing upon, or connection with, the admission or declaration in evidence is a requirement of relevance. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 850.)

10

court ultimately ruled, "*All we do know* is that he did not seek the assistance of [County] until 24 hours after [the] incident occurred." (Italics added.) The trial court's ruling was, effectively, not merely a ruling limiting jury argument but an evidentiary ruling that any evidence from the medical records, proffered by the *People* or appellant, of appellant's statements relating what he did before he sought assistance from the County, and offered for their truth, was inadmissible. (Accordingly, the trial court gave the limiting instruction as to the medical records upon which Hilton relied.) The trial court's ruling rendered appellant's proffered first and second statements irrelevant and inadmissible as rebutting evidence.

Finally, appellant argues the prosecutor's previously quoted comments during closing argument violated the trial court's ruling limiting prosecutorial argument. However, appellant failed to object on the ground of prosecutorial misconduct and request a jury admonition with respect to the challenged comments (appellant was required to do both), and a jury admonition would have cured any harm. Appellant waived the issue of whether the comments constituted misconduct. (Cf. *People v. Gionis* (1995) 9 Cal.4th 1196, 1215 (*Gionis*); *People v. Mincey* (1992) 2 Cal.4th 408, 471 (*Mincey*).)

Moreover, even if the challenged prosecutorial comments were misconduct, we evaluate the misconduct for prejudice and to determine whether appellant's right to due process was violated. (*People v. Bell* (1989) 49 Cal.3d 502, 534.) During jury argument, appellant acknowledged the prosecutor argued appellant did not immediately go to the hospital. Appellant's counsel then commented, "We actually don't know that," appellant might have gone to County at 12:30 a.m. on September 27, 1995, and appellant was not sophisticated enough to know police might submit a medical alert to a hospital.

In its final charge, the court, using CALCRIM No. 104, told the jury nothing attorneys say was evidence, and their remarks during closing arguments were not evidence. We presume the jury followed the instruction. (Cf. *People v. Sanchez* (2001)

11

26 Cal.4th 834, 852.)  There was strong evidence of appellant's guilt,[8] whether or not he delayed seeking medical treatment to avoid detection.  The alleged misconduct was neither prejudicial nor violative of appellant's right to due process.

3. *The Court Did Not Erroneously Fail to Take Judicial Notice of Certain Matters.*

During direct examination, Martinez testified he had suffered felony convictions for drug possession and possession of drugs for sale, he had been "convicted of drugs dating back to the late '80's," and, except for one felony conviction, all of his felonies related to "drugs and drug use and sales."  His most recent arrest for drugs occurred on June 8, 2011, and, on November 10, 2011, he was convicted of that drug charge.  During the pendency of proceedings in that case, Martinez was in county jail.  During cross-examination, Martinez testified as follows.  Martinez had his jailhouse conversation with appellant in August 2011.  In Martinez's drug case, he was offered a plea bargain of five years in prison.  Martinez took the deal.  If Martinez's case had gone to trial, he would have faced three years' imprisonment for each of his prior drug sales convictions.

Pelletier testified that on October 10, 2011, he interviewed Martinez in jail and Martinez said the following.  Martinez wanted Pelletier to have the prosecutor in the present case meet Martinez in court on November 3, 2011, the date of Martinez's next court appearance.  Martinez hoped the prosecutor would help Martinez in his case.

---

[8]     This includes the strong evidence appellant was at least an accomplice.  Appellant acknowledges "[[a]ppellant's] presence at the scene was conceded by the defense – the defense conceded that Hernandez was the male whom Barrera and Evangelista saw sitting on the stairs and running out of the building bleeding . . . ."  We note a "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)  Factors relevant to a determination of whether a defendant was an accomplice include *presence at the scene of the crime, companionship, and conduct before and after the offense.* (*People v. Singleton* (1987) 196 Cal.App.3d 488, 492.)

Later during the People's case-in-chief, the court, outside the presence of the jury, indicated appellant had asked the court to take judicial notice Martinez faced a "30 year imprisonment" in Martinez's case. Appellant indicated Martinez's file was in the courtroom and contained an information alleging against Martinez four Health and Safety Code section 11370.2, subdivision (a) enhancements and nine Penal Code section 667.5, subdivision (a) enhancements.[9]

Appellant indicated when Martinez (offering to provide information about appellant's case) contacted a deputy in a courtroom, Martinez's case was next scheduled for jury trial, Martinez thought he was facing 26 years in prison, and he was looking for a better deal. The court disagreed. The court indicated a "transfer memo"[10] clearly reflected not only that Martinez's maximum exposure in that case was 26 years in prison, but that the People had offered five years in prison and appellant had requested two years in prison, so for appellant to represent Martinez thought he was looking at 26 years was inconsistent with "the court file."

Appellant asserted (without citation to authority) a transfer memo was not part of the court record in Martinez's case, and appellant was simply asking the court to take judicial notice of the information in Martinez's case. The court indicated everyone present was experienced enough to know that before Martinez's case was transferred to department 100, discussions conducted in Martinez's presence would have established his maximum exposure was 26 years in prison, the People's last offer was five years in prison, and appellant's counteroffer was two years in prison. The court indicated it would not permit the jury to be told, or counsel to argue, Martinez thought he was facing 26 years in prison.

---

[9] In 1995, a Health and Safety Code section 11370.2 enhancement was a three-year prison term (Health & Saf. Code, § 11370.2, subds. (a)-(c)) and a Penal Code section 667.5, subdivision (a) enhancement was a three-year prison term.

[10] We note in *People v. Noriega* (1997) 59 Cal.App.4th 311, 318, a "transfer memo" was a memorandum written by a judge before transferring a case to department 100 for trial.

13

Appellant's counsel subsequently stated, "Forget that issue for a second. What I really want the court to take notice of was the menacing case."[11] Appellant indicated that, in Martinez's case, Martinez was in court on October 6, 2011, jury trial was scheduled for about November 6, 2011, and Martinez made his statement to Pelletier on the eve of the date his case was scheduled for jury trial.

The court indicated it had no problem if Martinez "posited a series of dates." The following then occurred: "The Court: I will read the dates that he appeared in court prior to entering a plea. [¶] [Defense Counsel:] Thank you, your Honor. [¶] The Court: That is the extent of what the court will take judicial notice of." Appellant said no more on the issue of judicial notice.

Later, the court reminded the jury it had heard testimony Martinez and appellant had been concurrently in custody. The court took judicial notice Martinez's case began on June 27, 2011, he had court appearances on specified dates in the months of July through October 2011, inclusive, he had court appearances on November 3, 7, and 9, 2011, and his last court appearance was on November 10, 2011. The court took judicial notice of a total of 10 dates.

Appellant claims the trial court erroneously failed to take judicial notice of "the charges in Martinez's case, including the fact that the information alleged five three-year prior convictions under Health and Safety Code section 11370.2 and five one-year priors under Penal Code section 667.5." Appellant also claims the trial court erroneously failed to take judicial notice of "the dates and nature of the proceedings in that case, as reflected in the court's docket."

Appellant asked the court to take judicial notice of the information filed in Martinez's case and the alleged fact Martinez's maximum exposure was 26 years in prison. However, after the court indicated it would not permit the jury to be told, or counsel to argue, that Martinez thought he was facing 26 years in prison, appellant's

_____

11      Appellant, in his opening brief, suggests appellant's trial counsel was indicating he wanted the trial court to take judicial notice the docket in Martinez's case reflected Martinez's trial was impending.

14

counsel subsequently stated, "*Forget* that issue for a second. What I *really* want the court to take notice of was the menacing case." (Italics added.) Appellant's counsel subsequently argued accordingly. He did not return to the issue he told the trial court to forget temporarily, nor did appellant subsequently request the court to take judicial notice of the information filed in Martinez's case or the alleged fact Martinez's maximum exposure was 26 years in prison.

The court ruled it would take judicial notice only of the dates on which Martinez appeared in court prior to entering a plea in his case. Appellant thanked the court and commented no further concerning judicial notice, and the court moved on to other issues.

A trial court's determination of the propriety of taking judicial notice implicates Evidence Code section 352 considerations. (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578; Evid. Code, § 454, subd. (a)(2).) We evaluate a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 724 (*Waidla*)).

The trial court refused to take judicial notice of the information filed in Martinez's case and the alleged fact Martinez's maximum exposure was 26 years in prison. The court refused to take judicial notice because doing so would have confused the issues and misled the jury to believe Martinez provided information to law enforcement simply because he faced 26 years in prison in his case, when in fact the People's plea bargain offer, and appellant's counteroffer, involved less prison time. The court's refusal was effectively a ruling under Evidence Code section 352.

We also note the jury heard evidence Martinez had suffered multiple prior drug sale convictions, faced three years in prison for each prior drug sale conviction, and spoke to appellant in jail in August 2011. The jury also heard evidence Martinez spoke to Pelletier on October 10, 2011, wanted to meet with the prosecutor on November 3, 2011, in the hope the prosecutor would help Martinez, and, on November 10, 2011, was convicted by plea in his case. Cumulative evidence may be excluded under Evidence Code section 352. (*Mincey, supra,* 2 Cal.4th at p. 439.) Judicial notice of the information filed in Martinez's case and the alleged fact Martinez's maximum exposure

15

was 26 years in prison as proof Martinez provided information to law enforcement in the hope of leniency would have been cumulative.[12]

Moreover, the court took judicial notice of dates of the proceedings in Martinez's case; to that extent, no error occurred. As to judicial notice of the nature of the proceedings, we note the following. The court took judicial notice of 10 dates. The trial court reasonably could have concluded the taking of judicial notice of the proceedings' "nature" (an undefined term conceivably including everything that happened during proceedings) on 10 different dates in Martinez's case would have involved undue consumption of time and confusion of issues in appellant's case. The jury heard evidence Martinez faced three years' imprisonment for each of his prior drug sales convictions if he went to trial, he was in court on October 6, 2011, he wanted to meet with the prosecutor on November 3, 2011, and he wanted leniency. The jury also heard evidence Martinez was convicted on November 10, 2011 pursuant to a plea bargain. The trial court reasonably could have concluded judicial notice of the "nature" of the proceedings would have been cumulative.[13]

_____

[12] In his petition for rehearing, appellant cites *People v. Bracey* (1994) 21 Cal.App.4th 1532, 1542 (*Bracey*) for the proposition that it is established that invocation of Evidence Code section 352 implicates the exercise of trial court discretion with the result an appellate court cannot rely upon reasons not cited by the trial court to uphold a section 352 ruling. Appellant's reliance upon *Bracey* is misplaced. *Bracey* involved, not section 352, but Penal Code section 1385, which requires a trial court to state in its minutes the reasons for a dismissal under section 1385. *Bracey* concluded an appellate court could not uphold such a dismissal by considering reasons not stated in the minutes. (*Bracey*, at pp. 1540-1542.)

[13] Appellant argued in his petition for rehearing that the above sentence was "reasoning" not proposed or briefed by either party; therefore, Government Code section 68081 precludes our reliance on said reasoning. We disagree. Section 68081 bars appellate court reliance, not on reasoning neither proposed nor briefed, but on issues neither proposed nor briefed.

16

Fairly read, the record reflects the trial court took judicial notice of the dates on which Martinez appeared in court prior to entering a plea in his case, and the trial court properly refused, under Evidence Code section 352, to take judicial notice of anything else. Moreover, the application of ordinary rules of evidence, as here, did not impermissibly infringe on appellant's right to due process. (Cf. *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.)

4. *The Court Did Not Err by Excluding Defense Exhibits J and K.*

During trial, appellant proffered defense exhibits J and K (hereafter, exhibits J and K, respectively), each of which appears to be a copy of a photograph. Exhibit J appears to depict the floor of a building, the view down a hallway on that floor, and, in the foreground, a staircase beginning on that floor. Exhibit K appears to depict a staircase from a vantage point on the staircase, looking downward towards the floor where the staircase begins, and also appears to depict, on said floor, an elevator door. Neither exhibit appears to depict blood.

During appellant's cross-examination of Frank Bolan (a Los Angeles police detective at the time of the investigation), Bolan testified exhibit J depicted what one would see if one were on the first floor standing by the staircase. He also testified a common hallway was directly ahead and the staircase ended on the first floor. After appellant marked exhibit K, appellant's counsel asked Bolan, "if you were to go down the stairs and approach the first floor, straight ahead there is a door to an elevator?" The prosecutor objected to the question, Bolan did not answer it, and appellant's counsel later asked, "would that be a door to an elevator?" (*Sic.*) Bolan replied yes. The prosecutor asked, "[a]s it existed back then?" and Bolan replied yes.

Appellant asked Bolan a question about a third exhibit (a copy of a photograph) and the court later asked, "You have no idea when these pictures were taken, do you?" Bolan replied no. Bolan later denied knowing how many stairwells were in the building.

17

After the parties rested subject to the admission of exhibits, the prosecutor objected to the admission into evidence of exhibit K. The court stated, "The court concurs there was not adequate testimony that that in fact was a danger point [*sic*] that the witness had privy to." Appellant claimed testimony demonstrated exhibit K depicted the staircase that had had blood on it. The court excluded exhibit K. The court indicated it was clear to the court there were multiple staircases in the apartment building, one had a blood trail and another did not, and the court was excluding exhibit K because there was inadequate foundation as to whether exhibit K depicted the staircase used by the person who had been bleeding. The prosecutor similarly objected to exhibit J, arguing there were two staircases and detectives only stated the staircase depicted in exhibit J looked like one of the staircases in the building. The court stated it concurred. Appellant argued he "made it very clear" exhibit J depicted the hallway and the staircase with blood on it.

The court observed there was inadequate foundation the "pristine" stairwell depicted in exhibits J and K was the stairwell used by the person who had been bleeding while trying to leave the apartment. Appellant then argued his "point" was to demonstrate the layout of the building. The court indicated the exhibits lacked probative value under Evidence Code section 352 if they depicted a "cleaned up apartment building." The court commented no one ever asked if there were multiple staircases, but it was obvious to the court that there were. The court questioned the relevance of evidence of the layout of the building and observed the photographs were not shown to Evangelista. The court indicated exhibits J and K lacked foundation and, under Evidence Code section 352, they were confusing. The court excluded both exhibits.

Appellant claims the trial court erred by excluding exhibits J and K. We reject the claim. We review for abuse of discretion a trial court's rulings on relevance and/or Evidence Code section 352 objections. (*Waidla*, *supra,* 22 Cal.4th at pp. 717, 723-724.) Authentication, including authentication of a photograph, is a subset of relevance. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266-267.)

The record reflects appellant initially was proffering exhibits J and K as evidence of the once-bloodstained staircase. However, Bolan denied he knew when the photographs were taken. The court alluded to them as depicting a pristine stairwell. We have viewed the exhibits; as mentioned, neither appears to depict blood. Although appellant maintained below there was testimony the exhibits depicted the once-bloodstained staircase, appellant cites no such evidence here. The trial court did not abuse its discretion by excluding exhibits J and K as irrelevant.

Even if the exhibits depicted the once-bloodstained staircase, i.e., the staircase used by the three men to flee, the trial court reasonably could have excluded the exhibits under Evidence Code section 352 as confusing and misleading. The court reasonably could have concluded the exhibits were confusing and/or misleading because the jury might have thought, based on the depiction of a pristine staircase, that the staircase was pristine the day of the killing and, since there was evidence appellant was bleeding that day, he did not use the staircase and was not involved in the killing. This problem is related to the fact Bolan testified he did not know when the photographs underlying the exhibits were taken.

Appellant also argued exhibits J and K were evidence of the layout of the building. However, as mentioned, appellant cites no evidence the depicted staircase was the one the three men used. The trial court did not abuse its discretion by excluding the exhibits as irrelevant as evidence of the layout of the building. Moreover, there was ample evidence three persons ran down a staircase; evidence of a staircase itself was cumulative. The trial court reasonably could have concluded the exhibits were confusing or misleading for the reasons previously discussed. The trial court did not abuse its discretion by excluding defense exhibits J and K under Evidence Code section 352. Moreover, the application of ordinary rules of evidence, as here, did not impermissibly infringe on appellant's right to due process.

19

5. *The Prosecutor's Jury Argument was Proper.*

During voir dire of the prospective jurors, appellant's counsel presented an anecdote related to aiding and abetting liability. He commented to the effect one time when he was a child in school, a bully did something to him, and appellant's counsel was running home crying when he met his older brother. Appellant's counsel told his older brother what had happened. The older brother, indicating he would beat up the bully, left appellant's counsel, who was sobbing on a bench. The older brother then went to the bully and beat him up. At trial, appellant's counsel asked a prospective juror whether appellant's counsel was responsible for his older brother beating up the bully, where appellant's counsel had never encouraged or helped his older brother beat up the bully, although appellant's counsel secretly had wanted his older brother to beat up the bully. The prospective juror replied no.

During closing argument, the prosecutor commented, "Remember the hypothetical that you were given during the voir dire process where it was about the bully and Tom and Jerry [*sic*], and, . . . I didn't know where they were going to go, and I was kind of crying because I got beat up, and they went and beat up my bully? I'm not really responsible. The defense – that wasn't just an idle hypothetical." Appellant's counsel stated, "Objection, commenting on the evidence." (*Sic*.) The court overruled the objection.

The prosecutor argued the defense presented the anecdote to forecast the defense position and cause the jury to think that if, in appellant's case, the two other males were shooters, and appellant did not know anything about the shooting, appellant was not responsible. The prosecutor also argued the anecdote was contrary to the law and evidence.

The prosecutor later indicated the anecdote contradicted the defense position in this case. The prosecutor commented, inter alia, that, in the anecdote, appellant's counsel did not accompany his older brother when the latter went to the bully. Appellant's counsel stated, "Objection, commenting on the evidence." (*Sic*.) The court indicated it would permit the prosecutor to comment on the anecdote but directed the prosecutor not

20

to refer to the intent of appellant's counsel in presenting the anecdote. The prosecutor continued discussing the anecdote, noting, inter alia, that, just as appellant's counsel in the anecdote had a motive to harm the bully, appellant had a motive to kill Saravia. The prosecutor commented however that, unlike appellant's counsel in the anecdote, appellant accompanied his accomplices to shoot and kill Saravia.

Appellant claims the prosecutor's jury argument was improper. We conclude otherwise. Appellant failed to object on the ground of prosecutorial misconduct and request a jury admonition with respect to the challenged comments, and a jury admonition would have cured any harm. Appellant waived the issue of whether the comments constituted misconduct. (Cf. *Gionis, supra,* 9 Cal.4th at p. 1215; *Mincey, supra,* 2 Cal.4th at p. 471.)

Moreover, we reject appellant's claim on its merits. In *People v. Chatman* (2006) 38 Cal.4th 344, our Supreme Court rejected a defendant's claim the prosecutor, during jury argument, repeated certain improper argument. *Chatman* then stated the prosecutor "merely commented on discrepancies between defense counsel's opening statement and defendant's actual testimony, and pointed out gaps in defense counsel's argument. 'It is no misconduct to pointedly highlight, as the prosecutor did here, the contradictions in a defendant's case.' [Citation.]" (*Id.* at p. 385.)

Similar reasoning applies here. There was no reasonable likelihood the prosecutor's comments were misconstrued or misapplied by the jury, or interpreted in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970.) The comments did not render appellant's trial fundamentally unfair in violation of his right to due process, nor did the prosecutor use deceptive or reprehensible methods to attempt to persuade the court or jury. (See *People v. Hill* (1998) 17 Cal.4th 800, 819.) No prosecutorial misconduct occurred.

6. *No Instructional Error Occurred.*

a. *The Court Did Not Err in its Instructions Relating Perfect or Imperfect Self-Defense to a Nonshooter.*

The court, using CALCRIM Nos. 500 and 520, instructed on homicide and murder, respectively.[14] The court, using CALCRIM No. 400, instructed on the general principles of aiding and abetting, and, using CALCRIM No. 401, instructed on aiding and abetting intended crimes.[15] The court, using CALCRIM Nos. 505 and 571, instructed the jury on perfect self-defense and imperfect self-defense, respectively.[16] Finally, the court,

---

[14] CALCRIM No. 500, stated, in relevant part, "Homicide is the killing of one human being by another. Murder is a type of homicide. The defendant is charged with murder." CALCRIM No. 520, stated, in relevant part, "The defendant is charged with murder. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; [¶] AND [¶] 3. He killed without lawful justification."

[15] CALCRIM No. 400, stated, in relevant part, "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." CALCRIM No. 401, stated, in relevant part, "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

[16] CALCRIM No. 505 stated, in relevant part, "The defendant is not guilty of murder if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against that danger." CALCRIM No. 571 stated, in relevant part, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. [¶] . . . [¶]

22

using CALCRIM No. 200, instructed the jury to "[p]ay careful attention to *all* of these instructions and consider them *together*." (Italics added.)

Appellant claims CALCRIM No. 505, the instruction on perfect self-defense, erroneously instructed that perfect self-defense applied to appellant only if he shot Saravia but not if someone else shot him. He argues, inter alia, CALCRIM No. 505 "provided no basis upon which a jury could conclude that appellant Hernandez might be found not guilty . . . if one of his companions acted in lawful . . . self-defense or defense of another." We reject appellant's claim.

Appellate review of the adequacy of instructions is based on whether the trial court fully and fairly instructed on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving or not giving jury instructions, an appellate court must *consider the instructions as a whole* and assume jurors are intelligent persons capable of understanding and correlating all given instructions. (*Ibid.*) Moreover, "We credit jurors with . . . common sense [citation] and do not assume that [this] virtue[] will abandon them when presented with a court's instructions." (*People v. Coddington* (2000) 23 Cal.4th 529, 594.) The ultimate question is whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.)

First, appellant is essentially arguing the instructions teach perfect self-defense applies only to perpetrators, but appellant cites no case holding this. Second, there is no dispute perfect self-defense may apply to a perpetrator. In particular, there is no dispute the perpetrator who "killed" for purposes of murder and CALCRIM No. 520, can also be the perpetrator of a "killing" for purposes of perfect self-defense and CALCRIM No.

---

The defendant acted in imperfect self-defense or imperfect defense of another if: [¶] 1. The defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

23

505, the two acts are the same, and the result is perfect self-defense can apply to the perpetrator of a killing that would otherwise be murder under perpetrator liability.

Similarly, we conclude the jury, considering the instructions as a whole and employing common sense, reasonably would have understood an aider of a perpetrator who "killed" for purposes of murder and CALCRIM No. 520, could also be the *aider of the perpetrator of a "killing" for purposes of perfect self-defense and CALCRIM No. 505*, the two acts of aiding are the same, and the result is perfect self-defense could apply to the aider of a perpetrator of a killing that would otherwise be murder under aiding and abetting liability.

If the case were otherwise, the anomalous result would be the aider, who did not directly commit the act at issue, would bear criminal responsibility while the perpetrator, who directly committed the act, bore no criminal responsibility, even though the actions of aiding, and perpetrating, respectively, were otherwise equally justified. This would lead to results contrary to common sense. For example, appellant's argument, taken to its logical conclusion, would mean that if a wife furnished a gun to her husband so he could defend her from a man attempting to rape her, and her husband, defending her, shot and killed the man, intending to kill him, the husband would escape scot-free from a murder charge because perfect self-defense of another applied to him, but his wife would be sent to prison because perfect self-defense of oneself did not apply to her.

We realize that, as appellant observes, CALCRIM No. 401 refers to "aiding and abetting that *crime*" (italics added) and refers to someone who aids and abets a "crime." However, appellant is construing those phrases as if they expressly state (which they do not) that a defendant cannot aid a perpetrator's killing for purposes of *perfect self-defense*. We note in this regard CALCRIM No. 400 refers to aiding and abetting *a perpetrator* (not aiding and abetting a crime).

We hold the trial court did not err by giving CALCRIM No. 505 on perfect self-defense, and there is no reasonable likelihood the jury believed perfect self-defense (or perfect self-defense of another) applied to appellant only if he shot or killed Saravia but not if someone else shot or killed him. Similar reasoning compels the conclusion the trial

24

court did not err by giving CALCRIM No. 571 on imperfect self-defense. There is no reasonable likelihood the jury believed imperfect self-defense (or imperfect self-defense of another) applied to appellant only if he shot or killed Saravia but not if someone else shot or killed him.[17]

---

[17] Appellant's reliance on *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), is misplaced. *Beltran* held a jury instruction concerning a defendant's mental state was *proper*. (*Id.* at pp. 954, 956-958. *Beltran* observed "the relevant mental state [was] properly set out in [the instruction]." (*Id.* at p. 956) In dicta, *Beltran* also concluded that potentially ambiguous comments during jury argument, including those by the prosecutor, did not render the allegedly erroneous *instruction prejudicial*. (*Id.* at pp. 955-957.) However, appellant states, "The error in *Beltran* was deemed to be one of state law only. The court reasoned that *the error was a failure to instruct* fully 'on all lesser included offenses and theories thereof which are supported by the evidence,' . . . ." (Italics added.) Appellant misreads *Beltran*, which held *no* instructional error occurred.

Moreover, in the present case, during the prosecutor's rebuttal argument, the prosecutor commented without objection at the time, "mind you self-defense is basically saying I did it, but I had a lawful justification for doing it. That's what self-defense is, under the law, which is different than what the defense suggests to you in the opening. [¶] The defense didn't suggest to you yeah, I did it. The defense suggested to you in the opening that the defendant wasn't even involved, that he was just sitting on the stairs waiting, that he had no idea of what was happening at that apartment." Appellant, citing a portion of the above comment, argues the prosecutor "[led] the jury to believe that only the actual shooter was legally entitled to invoke self-defense."

To the extent appellant argues the prosecutor's comment rendered the alleged instructional error prejudicial, we reject the argument. The prosecutor's comment, reasonably construed, was to the effect that appellant was denying any criminal involvement. The prosecutor's comment, reasonably construed, was not to the effect that (1) appellant was saying he was criminally involved as an aider and abettor or (2) self-defense applied only to an actual shooter and not to an aider and abettor. None of the comments of the trial court cited by appellant compel a contrary conclusion.

To the extent appellant argues the prosecutor's comment was, independently, misconduct, the argument is unavailing. Appellant did not object on the ground of prosecutorial misconduct and request a jury admonition with respect to the challenged comment, and a jury admonition would have cured any harm. Appellant waived the issue of whether the comment constituted misconduct. (Cf. *Gionis, supra,* 9 Cal.4th at p. 1215; *Mincey, supra,* 2 Cal.4th at p. 471.) Appellant claims "*Beltran* . . . concluded that the error was not forfeited by the failure of defense counsel to object to the prosecutor's

25

Finally, the court, using CALCRIM No. 521, instructed on first degree murder based on willful, deliberate, and premeditated murder, and based on lying-in-wait murder. The instruction indicated lying in wait was a state of mind equivalent to premeditation or deliberation. Lying-in-wait murder is the functional equivalent of murder with premeditation, deliberation, and intent to kill. (*People v. Russell* (2010) 50 Cal.4th 1228, 1257; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 163.) The jury found appellant committed first degree murder. A mind determined to **murder** based on preexisting reflection is not a mind moved to kill by a belief, formed in immediate peril, in the necessity to defend against that peril, an essential element of perfect and imperfect self-defense. The jury, having found the murder was of the first degree, i.e., with premeditation and deliberation, necessarily rejected any evidence appellant killed in perfect or imperfect self-defense. The alleged instructional error regarding perfect or imperfect self-defense was harmless under any conceivable standard. (Cf. *People v. Manriquez* (2005) 37 Cal.4th 547, 582 (*Manriquez*); *People v. Crandell* (1988) 46 Cal.3d 833, 874; see *People v. Lewis* (2001) 25 Cal.4th 610, 646.)[18]

---

argument. (*Id.* at p. 954[,] fn. 15.)" However, in footnote 15 in *Beltran*, our Supreme Court (1) did not hold one way or the other as to whether any error was forfeited, (2) did not hold the *instruction* in that case was error, (3) stated *the prosecutor's comment to the jury* in that case "arguably" approached improper argument condemned in *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*), (4) did not hold whether the prosecutor's comment in *Beltran* was error or misconduct, and (5) in fact acknowledged that "*Najera* concluded the defendant forfeited any prosecutorial misconduct claim by failing to object." (*Beltran*, at p. 955, fn. 15.)

[18] Appellant argued in his petition for rehearing that our above conclusion constituted consideration of an unraised issue in violation of Government Code section 68081 because "*respondent* [did not] argue that if there was error as appellant alleged, the error could be found to be harmless." (Italics added.) We disagree. Appellant himself, in his opening brief, proposed and briefed the issue of prejudice. Even if section 68081 could apply to our determination of an issue of prejudice (see Cal. Const., art. VI, § 13), section 68081 is inapplicable here.

26

b. *The Court Did Not Err in its Instruction on Perfect Self-Defense and Reasonably Necessary Force.*

Appellant claims the trial court erred by instructing, using CALCRIM No. 505, to the effect perfect self-defense (or perfect defense of another) required that "The defendant used no more force than was reasonably necessary to defend against that danger." That is, he argues the third enumerated requirement in CALCRIM No. 505 (see fn. 16, *ante*) is erroneous. We reject the claim.

First, appellant cites no authority holding this requirement is erroneous. Second, in *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*), a case in which the defendant was charged with murder and convicted of voluntary manslaughter (*id.* at pp. 1076, 1080-1081), our Supreme Court, discussing perfect self-defense, stated, "Although the belief in the need to defend must be objectively reasonable, a jury *must* consider *what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .'* [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.]" (*Id.* at pp. 1082-1083, italics added.)

*Humphrey* continued, "To do this, it must consider all the ' " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which a *reasonable* man would act in protecting his own life or bodily safety.' " ' [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' [Citation.]" (*Humphrey, supra*, 113 Cal.4th at p. 1083.) We also note that in *People v. Pinholster* (1992) 1 Cal.4th 865, a murder case (*id.* at p. 902), our Supreme Court stated, "any right of self-defense is limited to the use of such force as is reasonable under the circumstances." (*Id.* at p. 966.)

27

The challenged language in CALCRIM No. 505 comports with *Humphrey* and *Pinholster w*hich, of course, we must follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) No instructional error occurred. Moreover, given the jury's finding the murder was of the first degree, the alleged instructional error was not prejudicial. (Cf. *Manriquez, supra,* 37 Cal.4th at p. 582.)[19]

c. *The Court Did Not Err in its Instruction on Imperfect Self-Defense and a Belief Force is Reasonably Necessary.*

Appellant claims if CALCRIM No. 505 properly requires for perfect self-defense that "The defendant used no more force than was reasonably necessary to defend against that danger," the court should have instructed imperfect self-defense (discussed in CALCRIM No. 571) applied if the defendant or his companions "had a good faith but mistaken belief that he was using no more lethal force than was necessary."

The claim is unavailing. The instruction correctly stated the law and was responsive to the evidence; therefore, by failing to request clarification or amplification below, appellant waived the instructional issue he raises here. (Cf. *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051; *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.)

Even if the issue were not waived, appellant's claim is without merit. First, appellant cites no authority holding such an instruction is required. Second, appellant's argument erroneously conflates the more demanding principles of justification with less demanding principles of mitigation, and thus adds to the latter principles a requirement erroneously derived from the former principles. Third, "[t]he *subjective* elements of [perfect] self-defense and imperfect self-defense are *identical*. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262,

---

**19** Appellant argued in his petition for rehearing that our above conclusion on the issue of prejudice constituted consideration of an unraised issue in violation of Government Code section 68081. We disagree. Appellant himself, in his opening brief, proposed and briefed the issue of prejudice. Even if section 68081 could apply to our determination of an issue of prejudice (see Cal. Const., art. VI, § 13), section 68081 is inapplicable here.

28

italics added; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 [same].)  Case law has concluded CALCRIM No. 571 correctly states the law of imperfect self-defense.  (See *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306-1307; see generally, *Humphrey, supra*, 13 Cal.4th at p. 1082 [actual belief in need to defend, plus fear of imminent harm].)  No further instruction on the subjective element of imperfect self-defense was required.  Finally, given appellant's conviction for first degree murder, the alleged instructional error was not prejudicial.[20]  (Cf. *Manriquez, supra,* 37 Cal.4th at p. 582.)[21]

---

[20]    Appellant argued in his petition for rehearing that our above conclusion on the issue of prejudice constituted consideration of an unraised issue in violation of Government Code section 68081.  We disagree.  Appellant himself, in his opening brief, proposed and briefed the issue of prejudice.  Even if section 68081 could apply to our determination of an issue of prejudice (see Cal. Const., art. VI, § 13), section 68081 is inapplicable here.

[21]    In light of our Discussion, we reject any claims in this case that appellant's constitutional rights were violated, he was denied effective assistance of counsel by any failures of his trial counsel to pose appropriate objections as to any issues (see *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219), or cumulative prejudicial error occurred.

## *DISPOSITION*

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KITCHING, J.

We concur:


EDMON, P. J.


EGERTON, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.